STATE of Wisconsin, Plaintiff-Respondent,

v.

Eric D. COOKS, Defendant-Appellant.

Court of Appeals

*No. 2006AP72–CR. Submitted on briefs September 21, 2006.*
*—Decided November 1, 2006.*

2006 WI App 262

(Also reported in 726 N.W.2d 322.)

██

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Joseph E. Redding* of *Glojek Limited*, West Allis.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sally L. Wellman*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Brown, Nettesheim and Anderson, JJ.

¶ 1. ANDERSON, J. Eric D. Cooks appeals from a judgment of conviction of seven counts stemming from a robbery and an order denying his motion for postconviction relief based on claims of ineffective assistance of counsel. Cooks challenges his trial counsel's effectiveness on several grounds. Cooks claims his counsel was ineffective for failing to object to: (1) the sending of police reports to the jury room, (2) the admission of evidence regarding a victim's miscarriage that occurred shortly after the crime, and (3) the admission of a victim's testimony that he knew Cooks from a previous jail term. We hold that Cooks has failed to demonstrate ineffective assistance of counsel on those grounds and affirm the portion of the trial court's order concluding the same.

638

¶ 2. However, Cooks also maintains that his trial counsel's failure to pursue an alibi defense by investigating alibi witnesses, calling them to testify and raising the alibi during closing arguments constituted ineffective assistance of counsel. The State concedes, and we agree, that Cooks' trial counsel performed deficiently in this regard. Cooks' counsel had a duty to investigate the alibi witnesses Cook provided. We further conclude that such performance prejudiced Cooks' defense. The State's case against Cooks was less than airtight and additional alibi witnesses could have added substance and credibility to Cooks' testimony that he was at his mother's house on the night the crime was committed. Accordingly, we reverse the judgment of conviction and the relevant portion of the trial court's order and remand for a new trial.

### Facts

¶ 3. On April 22, 2003, the State filed a complaint, charging Cooks with multiple offenses, including one count of armed burglary, three counts of armed robbery and three counts of false imprisonment, all as repeat offenses. The complaint states that on April 13, Carrie Metz, Douglas Marshall, and Peter Davis reported a robbery to the City of Kenosha Police Department.

¶ 4. Michael R. Barth represented Cooks at trial. Cooks' ineffective assistance of counsel claims demand an inquiry into the testimony of the trial witnesses. We therefore recount pertinent portions of the testimony below.

¶ 5. Metz first testified to the events of April 12, the night before the crime. She stated that she and her then fiancé, Marshall, had around ten people, including Cooks, over to her house. Metz, who is five feet three

639

inches tall, testified that Cooks gave her the nickname "Shorty." According to Metz, she had approximately five to six thousand dollars in cash in her wallet that night and she had shown Cooks the money. She stated she acquired the money by introducing Marshall to a woman who hoped to get married to obtain a green card.

¶ 6. Metz next testified about the night of the robbery. Metz indicated that before midnight, but after 11:30 p.m. on April 13, her doorbell rang. When she went downstairs and opened the door, someone pointed a gun at her head. Three men wearing dark clothes and "nylon do-rags around their faces" pushed her down and ran inside. She stated that she knew that one of the individuals was Cooks "right away as soon as [she] opened the bottom door." She could tell it was him because he looked right at her. Metz testified that during the robbery Cooks called her "Shorty." After the three men left, Metz contacted the police. Metz told the police that Cooks was involved in the crime.

¶ 7. The following day, a crying and frantic Cooks found Metz and swore to her that he did not commit the crime. Metz testified that Cooks wanted her to go down to the police station and drop the charges. Metz went down to the police station. When asked by the prosecutor whether she dropped the charges, Metz responded:

> I went there to do it, but the cops realized I was just scared and I really didn't want to. I mean, I did want to drop the charges, yes, I did. I didn't want this to go on any further. I just wanted it to be over with. And my money was gone and I couldn't get it back. This is before I had the miscarriage, so I really didn't care at that point.

The prosecutor also asked Metz what made her want to drop the charges and she replied:

> [Cooks] said he'd get my money back. At that point I only cared about my money because I didn't know I

> was miscarrying at the time, so all I cared about was
> getting my money back . . . and he said that within two
> days, he'd get my money back that was stolen.

Before closing its direct examination, the prosecutor asked Metz, "You mentioned something about a miscarriage. Did something happen later on with respect to that?" To which Metz replied, "Three days after the robbery, I had a miscarriage, and two days after that, I lost the other baby." Metz had been carrying twins.

¶ 8. On cross-examination, Metz testified that she had five criminal convictions. Barth asked her if in January 2004 she told a district attorney that Cooks did not rob her and she would testify that "an innocent man is in jail." Metz denied ever making such a statement. Barth then asked, "So you've never told anyone that Mr. Cooks was an innocent man?" She responded, "I don't remember, maybe just to get it over with and to have it be done with . . . . I was only upset about my babies, and that's the only thing I can't get back."

¶ 9. Davis also testified to the events of April 13. Davis stated that he was in prison at the time of the trial and the court informed the jury, pursuant to a stipulation, that he had four convictions. Davis indicated that Metz had told him that Cooks committed the robbery but that he did not know Cooks at the time. Davis testified that he identified Cooks in a photo array, a fact later verified by the testimony of a police officer.

¶ 10. Marshall testified that he had not recognized any of the three men involved in the robbery. The prosecutor asked him to read the following from a written statement he had given to the police:

> I knew who he was. I knew him well from jail. He was
> also over at the apartment the night before. I knew he
> was Eric Cooks. I could also recognize his voice. He

knew I used to run with Folks. He kept calling me "Folks." When he was over the night before, he called me the same thing. He is the only person that has called me that since 1998.

The prosecutor read further, "I'm not sure if I could identify two of the guys if I saw them, but I'm positive the one was Eric Cooks." Marshall testified that, while he did know Cooks from jail and Cooks knew his nickname to be "Folks," the rest of these statements were false. Marshall then recanted the other portions of his written statement in which he referred to Cooks by name. He testified that he made the statements because he was "mad" at the time and Metz had told him who had committed the robbery. He stated that he made the whole story up and would not affirm these statements because he did not want to send an innocent person to prison. Marshall testified that he had contacted the police and indicated that he had not been accurate when he gave his statement to the police. Marshall testified that he was serving a sentence in state prison and the court informed the jury of the parties' stipulation that Marshall had eleven convictions.

¶ 11. Amanda Gross also testified for the State. Gross indicated that she and Cooks had an on-again, off-again romantic relationship, but that during April 2003, he had been staying over at her house on occasion. Gross testified that on April 13 Cooks came over to her house. Gross then read from a written statement she gave to police on April 15 in which she stated that when Cooks came over, "He was mad because he told me that [he] help[ed another individual] rob some people and they didn't get anything for the robbery." Gross, however, then testified that the statement was false. Gross testified that she went back to the police department to try to retract her statement. She claimed she

cooperated with police only because her landlord was present when Cooks was arrested at her apartment and she was afraid if she did not cooperate she would lose her lease.

¶ 12. Gross testified that she could remember Cooks telling Metz over the phone that he could come up with the money if she did not blame him for the robbery. Gross read from a subsequent statement to the police in which she stated, "Eric told me to tell the police that I lied in my statement," and "I do know that Eric was involved in this robbery case." She also admitted she heard Cooks telling another potential suspect over the phone that the other person was "dirty."

¶ 13. Lakeisha Cooks, Eric Cooks' younger sister, also testified for the State. Lakeisha Cooks testified that in May 2003 she was in jail and contacted the police to tell them she had information about a robbery concerning her brother. Lakeisha said that the police offered to make her a deal in her own criminal case, but she declined. She told police that at 11:45 p.m. on the night of the robbery, she saw Cooks at their mother's house. She heard Cooks tell their mother that he was going out of town and then saw him leave with two of his friends. Lakeisha Cooks refused to acknowledge telling the police that while he was in prison, Cooks contacted her and asked her to call Metz to see if she would drop the charges. She testified that she had been twice convicted of a crime.

¶ 14. Daniel Strash, a detective with the City of Kenosha Police Department, testified that he assisted with the investigation of the Metz robbery. Strash testified that at an April 14 meeting, Metz indicated to Strash that she wanted to recant her identification of Cooks because she was afraid of Cooks and his family, but that she ultimately did not change her story.

643

According to Strash, Metz also told him that Cooks had come to her, denied his involvement and offered to get the money back.

¶ 15. Mark Dooley, an assistant district attorney in Kenosha county, testified that in January 2004 he received a phone call from Metz. Metz informed Dooley that she had been arrested for disorderly conduct and wanted the charges dropped. Dooley told Metz, "I will not dismiss your case because you're a witness. You have to testify truthfully like anybody else." Metz became angry and told him, "Well, then Eric Cooks didn't rob me, and I'll testify an innocent man is in jail."

¶ 16. Cooks testified in his own defense. He admitted that he had been convicted of a crime eight times. Cooks stated that he went to Metz' house the night before the robbery to pick up his sister. He ended up staying for a little while because there was a "little party going on." Cooks saw that Metz had "a bundle of money" and told her that it was not safe or smart for her to have it out in the open. Shortly thereafter, Metz asked everyone to leave and Cooks and his sister complied with her request.

¶ 17. Cooks testified that, two days later, he heard through his girlfriend's father that Metz had accused him of robbing her. Cooks testified that he then went to Metz' friend's house. When he arrived, Metz was there and Cooks informed her that he did not commit the crime. Metz told Cooks to wait until Marshall arrived so that they could all discuss the robbery. Cooks testified that he had met Marshall when he was in jail. When Marshall arrived, Cooks told them that if he heard anything about the robbery and about who had her money, he would help her get it back. Metz told him that she was going to tell the police that she had made a mistake.

¶ 18. Cooks denied having taken part in the robbery. Cooks testified that on the night of the robbery, he was at his mother's house fighting with his little sister about whether she should travel with her infant son who had just had pneumonia. He said he babysat for his sister until his mother came home around 11:45 p.m. or 11:50 p.m. Cooks admitted going to Gross' house the evening of the robbery, but denied having told her that he was "mad at" one of the other suspects.

¶ 19. Following jury instructions, the court and the attorneys discussed which of the exhibits could go back to the jury room. During the discussion, the court asked if Barth had any problem with the police reports going to the jury room. Barth stated, "I generally don't like them to take police reports." The court replied, "Well, they were read verbatim, almost like a transcript, if they hadn't been referred to. How about the other one?" Barth responded, "That's fine, Judge. I guess they can go back." The jury ultimately convicted Cooks of the charged crimes.

¶ 20. Cooks filed a postconviction motion, alleging ineffective assistance of counsel. Cooks challenged Barth's (1) failure to investigate and call to testify several alibi witnesses and to present the alibi defense in his closing arguments, (2) failure to object to Metz' testimony "that she had a miscarriage of twins because of this incident," (3) failure to object to Marshall's testimony "that he knew Cooks from jail," and (4) failure to object to the written police reports going into the jury room.

¶ 21. Cooks attached several affidavits to the motion. Gerald Cooks, Eric Cooks' brother, averred that at around 11:15 p.m. on the evening of the incident, he and several other individuals, including Cooks, their sister Tanika Cooks, his girlfriend Dana Mehring, and Anthony Tanner were at Betty Platt's home. Platt is

Gerald, Tanika and Eric Cooks' mother. According to Gerald Cooks, the individuals were arguing about whether Tanika Cooks should take her children to Beloit. Gerald Cooks, Mehring and Cooks convinced Tanika Cooks to leave the children at Platt's house. At 11:40, Tanika Cooks and Anthony Tanner left. At about 11:45 p.m., Gerald Cooks and Mehring left for the liquor store to buy some alcohol. When they returned home shortly after midnight, Platt was home and told them that Cooks had just left.

¶ 22. Mehring's affidavit substantiates Gerald Cooks' story of the evening's events. Mehring averred that as they had tried to convince Tanika Cooks to stay until Platt came home from work at midnight, she specifically remembered Eric Cooks saying, "[I]ts only 20 minutes Tanika." She indicated that she and Gerald Cooks left for the liquor store closer to 11:50 p.m.

¶ 23. Platt averred that she and her husband arrived home around 11:50 p.m. that night and met Cooks on the front lawn. She explained that after speaking with Cooks for about five to ten minutes, "a girl in a gold car came and picked Eric up." Platt averred that when Mehring and Gerald Cooks returned home from the liquor store, they asked after Cooks and she explained that he had just left.

¶ 24. Crystal Rowlette stated that as she was driving by Platt's house in a gold automobile between 11:40 and 11:50 p.m. on April 13, Cooks flagged her down. Cooks asked if she would take him to Gross' house. She agreed and eventually dropped him off at Gross' house.

¶ 25. Several individuals testified at the *Machner*[1] hearing, including Barth, Mehring, Platt and Cooks.

---

[1] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

Barth testified that Cooks never provided him with information about any alibi witnesses or asked that the witnesses be called to testify until the actual trial. He did not believe that there was an alibi available for Cooks. He testified that his strategy was twofold, first, that the events did not unfold the way the State suggested and, second, that this was a case of misidentification. However, he did testify that there was no strategic or professional choice of why Cooks' alibi testimony was not used in his closing arguments.

¶ 26. Barth admitted that he spoke with Platt prior to trial, but that she indicated she did not want to testify and he did not think she had anything relevant to say. Barth admitted that Mehring did approach him about serving as an alibi witness at the time of the trial, but that he did not remember her as having any specific knowledge as to the night of April 13. Barth conceded that he never spoke with Cooks' sister Tanika or her boyfriend and that he did not conduct any other type of alibi investigation.

¶ 27. Mehring, who had never been convicted of a crime, also testified. She testified that she had spoken with Barth on many occasions about testifying on Cooks' behalf. She stated that she would have testified that she was with Cooks at his mother's house on the night of the robbery.

¶ 28. Platt testified that she had spoken with Barth on several occasions at her son's various court dates. She also stated that she told Barth what happened on April 13 and she would be willing to testify on Cooks' behalf.

¶ 29. Cooks testified that he spoke with Barth about his whereabouts on the night of April 13 and gave him names of individuals—Platt, Mehring, Gerald Cooks, Crystal Rowlette, Tanika Cooks and Anthony

647

Tanner—who would verify his story. Cooks testified that to his knowledge Barth had talked to Mehring, Tanika Cooks and Platt. Cooks testified that he told Barth to contact these witnesses and have them testify at trial.

¶ 30. Following the postconviction motion hearing, the court issued a written decision. The trial court concluded that Barth's investigation and presentation of an alibi defense was deficient. The court explained that Cooks asserted an alibi during his testimony and that

> [n]otwithstanding the fact that the alibi witnesses are friends or family, would it not have made sense to call them as corroborating witnesses since the defendant himself was testifying to an alibi defense? Clearly the uncorroborated alibi defense was of concern to the jury in their deliberations as one of the questions they asked was, "Could we have the distance between Cook's Mom's house and [Metz'] house to establish time frame?"

The court rejected as incredible Barth's testimony that Cooks never gave him the names of alibi witnesses or requested that they be called, that no family member ever told him of an alibi or that they might be a witness in support of an alibi defense and that alibi was not a defense theory. The court observed that three witnesses had discussed the alibi defense with Barth and had provided him with the names of the people who could verify the defendant was elsewhere at the time the crime was committed. The court asked, "How could alibi not be a theory of defense when you allow your client to testify before the jury that he was at his mother's home when the crime was committed? An [a]libi defense is entirely consistent with a defense of misidentification and in fact supports it."

648

¶ 31. The court, however, concluded that Cooks was not prejudiced by Barth's failure to pursue the alibi defense. The court reasoned that there was eyewitness identification from a victim, testimony from Cooks' sister that he left his mother's home with two male companions, and testimony from a friend that Cooks admitted committing a robbery and that none of the alibi witnesses were disinterested or impartial. The court also rejected Cooks' remaining ineffective assistance of counsel claims.

## Standard of Review

¶ 32. Criminal defendants are constitutionally guaranteed the right to counsel under the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 7 of the Wisconsin Constitution. The right to counsel includes the right to effective counsel. *Strickland v. Washington*, 466 U.S. 668, 685–86 (1984). The standard for determining whether counsel's assistance is effective under the Wisconsin Constitution is the same as that under the Federal Constitution. *See State v. Sanchez*, 201 Wis. 2d 219, 235–36, 548 N.W.2d 69 (1996).

¶ 33. To succeed on a claim of ineffective assistance of counsel, a defendant must show both that counsel's representation was deficient and that the deficiency was prejudicial. *Strickland*, 466 U.S. at 687. In order to establish deficient performance, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* A defendant must establish that counsel's conduct falls below

an objective standard of reasonableness. *Id.* at 687–88; *State v. Thiel*, 2003 WI 111, ¶ 19, 264 Wis. 2d 571, 665 N.W.2d 305. However, "every effort is made to avoid determinations of ineffectiveness based on hindsight . . . and the burden is placed on the defendant to overcome a strong presumption that counsel acted reasonably within professional norms." *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). To prove constitutional prejudice, "the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Thiel*, 264 Wis. 2d 571, ¶ 20 (quoting *Strickland*, 466 U.S. at 694).

¶ 34. Appellate review of an ineffective assistance of counsel claim presents a mixed question of fact and law. *State v. McDowell*, 2004 WI 70, ¶ 31, 272 Wis. 2d 488, 681 N.W.2d 500, *cert. denied*, 543 U.S. 938 (2004). We will not disturb the trial court's findings of fact unless they are clearly erroneous. *Id.* The ultimate determination of whether the attorney's performance falls below the constitutional minimum, however, is a question of law subject to our independent review. *Id.*

### Discussion

¶ 35. As he did in his postconviction motion, Cooks challenges Barth's performance on four grounds. We address each argument in turn.

### *Police Reports*

¶ 36. Cooks maintains that Barth should have objected to the police reports going to the jury. He cites the three factors from *State v. Hines*, 173 Wis. 2d 850, 860, 496 N.W.2d 720 (Ct. App. 1993), governing the

submission of exhibits to a jury and argues that the second factor, whether a party would be unduly prejudiced by submission of the exhibit, would have prevented the submission of the police reports. He claims that by failing to object, Barth allowed the State to make its case with the written police reports and left him to rely on the jury's recollection of his own testimony and therefore he was unduly prejudiced. *See id.* at 862 ("[I]t is inequitable to allow one side to make its case with written statements while requiring the other side to rely on the jury's recollection of oral testimony.").

¶ 37. Cooks has failed to establish ineffective assistance on this point. First, we cannot fully evaluate Cooks' claim. As the State points out, there is some confusion over what statements actually went back to the jury room. Cooks does not identify which witness statements went to the jury and which of those statements he believes were objectionable.

¶ 38. Second, Barth did object to the submission of the police reports. During an on-the-record discussion, the court asked if Barth had any problem with the police reports going to the jury room. Barth stated, "I generally don't like them to take police reports." Barth's objection prompted a rejoinder from the court, "Well, they were read verbatim, almost like a transcript, if they hadn't been referred to." Barth then responded, "That's fine, Judge. I guess they can go back."

¶ 39. Finally, assuming Barth did not object with sufficient vigor and all the statements went back to the jury room, Cooks can establish neither deficient performance nor prejudice. His ineffective assistance of counsel claim is premised on the trial court's correct ruling that the written statements could be sent back to the

jury room. *See State v. Ziebart*, 2003 WI App 258, ¶ 14, 268 Wis. 2d 468, 673 N.W.2d 369 ("Suffice it to say, however, that a defendant claiming ineffective assistance must establish both deficient performance and prejudice, and a claim predicated on a failure to challenge a *correct* trial court ruling cannot establish either." (citation omitted)). Contrary to Cooks' arguments, he was not unduly prejudiced by the submission of the reports. *See Hines*, 173 Wis. 2d at 860.

¶ 40. While the general rule in Wisconsin is to read a statement to a deliberating jury rather than to physically submit it, that rule is not absolute. *See State v. Mayer*, 220 Wis. 2d 419, 425, 583 N.W.2d 430 (Ct. App. 1998). Here, Cooks does not claim that the statements contained improper hearsay and giving the jury the written statements would not have unfairly emphasized the State's case. The core issue in this case was identification. Various witnesses had gone to the police and sworn out statements implicating Cooks and then went back to the police and recanted those statements and then "unrecanted" at trial. Barth argued to the jury that the witness statements contained in the police reports might have been the product of improper police bias or error and urged the jury to closely evaluate the accuracy of the reports. With the written statements before them, the jury would have been able to do just that.

¶ 41. Because Cooks cannot establish deficient performance and prejudice, his ineffective assistance of counsel claim based on the submission of the police reports fails.

### *Victim's Miscarriage Following Crime*

¶ 42. Cooks claims that Barth should have taken steps, such as filing a motion in limine, to prevent Metz' testimony concerning her miscarriage from coming into

evidence. Cooks points out that Barth knew of the miscarriage and argues that this evidence, which played to the jury's sympathies and aroused its instinct to punish, unfairly prejudiced him. *See* WIS. STAT. § 904.03 (2003–04)[2] (relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice); *State v. Sullivan*, 216 Wis. 2d 768, 789–90, 576 N.W.2d 30 (1998) (unfair prejudice results when the proffered evidence appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions in the case).

¶ 43. Cooks' arguments do not overcome the strong presumption that Barth acted reasonably and within professional norms. First, Barth could not have anticipated that Metz would testify about her miscarriage. Metz' testimony about her miscarriages twice came out unexpectedly and in a nonresponsive fashion to a question regarding her attempts to recant her identification of Cooks. As Barth testified at the *Machner* hearing, he could not have objected to Metz' testimony at trial because it came in "as an aside. It was not an expected answer."

¶ 44. Second, we will not second-guess Barth's trial strategy here. *See State v. Felton*, 110 Wis. 2d 485, 502–03, 329 N.W.2d 161 (1983) (stating that appellate courts are not to second-guess trial counsel's selection of trial tactics or the exercise of professional judgment after weighing the alternatives). Barth testified that he did not object to the State's follow-up on the point because "that was one of those things where the bell had

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

been rung." Barth reasonably concluded that to object to the follow-up question would draw unwanted jury attention to Metz' miscarriage. Therefore, Barth's failure to object to Metz' testimony about her miscarriage did not constitute deficient performance.

### *Previous Jail Time*

¶ 45. Cooks also claims that Barth should have objected to Marshall's testimony that he knew Cooks from jail. Cooks maintains that this evidence unfairly prejudiced him because it allowed the jury to judge the case "not upon the evidence, but upon the emotional proposition that [he] was an experience[d] jail inmate." *See* WIS. STAT. § 904.03; *Sullivan*, 216 Wis. 2d at 789–92.

¶ 46. Cooks fails to demonstrate Barth performed deficiently by not objecting to Marshall's testimony at trial. The State raised the issue before jury selection and the court ruled on it. The State told the court that it had raised with Barth the question of how to address Marshall's and Cooks' relationship and could not think of a way to ask Marshall how he knew Cooks without having him refer to their time in jail since that was their sole connection. The court asked for Barth's input and Barth offered no thoughts on the question. After carefully considering the question of prejudice, the court ruled Marshall could testify to his prior connection with Cooks. The court determined that the single statement, as long as Marshall was instructed not to dwell on the fact, would not prejudice Cooks. With the court already having ruled that the testimony was admissible, there was no reason for Barth to object anew at trial.

¶ 47. Furthermore, Cooks' ineffective assistance of counsel claim is premised on a correct trial court ruling and cannot succeed. *See Ziebart*, 268 Wis. 2d 468, ¶ 14. The probative value of Marshall's testimony was not outweighed by any danger of unfair jury prejudice. The theory of defense was misidentification. The nature of the prior contacts between Marshall and Cooks was relevant to show Marshall had a sound basis for making his identification of Cooks at the crime scene. Moreover, Cooks testified to having eight prior convictions. This would have reasonably suggested to the jury that Cooks probably had been incarcerated in the past and therefore detracts from any additional prejudice Marshall's testimony provided.

¶ 48. Cooks also suggests that Barth could have stipulated that Marshall knew him from prior contacts and therefore prevented the jury from knowing that he had been in prison. However, even assuming Barth was deficient for failing to so stipulate, Cooks has not established prejudice. Again, the jury could have easily inferred that Cooks had been in prison from his own testimony regarding his eight criminal convictions.

*Alibi Defense*

¶ 49. Cooks maintains that Barth should have investigated his alibi witnesses, called alibi witnesses to testify and argued that he had an alibi in counsel's closing statements. The trial court determined that Barth's failure to undertake these activities constituted deficient performance and the State, as it must, declines to challenge this finding on appeal.

¶ 50. Cooks, as the trial court found, provided Barth with the names of alibi witnesses and Barth had

Cooks testify to his alibi. However, Barth failed to investigate the potential alibi witnesses and argue Cooks' alibi to the jury. Barth failed to do so despite the fact that a corroborated alibi clearly would have reinforced Barth's misidentification theory of defense. Simply put, Barth, at the very least, had a duty to investigate Cooks' alibi and his failure to fulfill that duty constitutes deficient performance. *See Washington v. Smith*, 219 F.3d 620, 631 (7th Cir. 2000). Thus, our focus is on the prejudice prong of the *Strickland* test.

██

¶ 51. Cooks submits that his trial counsel's failure to pursue the alibi defense was prejudicial. Cooks contends that the other alibi witnesses who testified at the *Machner* hearing could have corroborated his story and provided the jury with a timetable showing that it was physically impossible for him to have committed the crimes. Cooks claims that his situation is almost identical to the one in *Washington*, 219 F.3d at 634–35, in which the Seventh Circuit determined that a trial counsel's failure to investigate an alibi defense prejudiced the defendant. The State fails to even address *Washington* in its response to Cooks' argument, instead choosing to quote the trial court's no-prejudice determination without further explanation.

¶ 52. In *Washington*, the State of Wisconsin charged Washington with robbing a tavern. At his trial, Washington testified in his own defense, as did two alibi witnesses whom Washington had secured for himself while in custody awaiting trial. *Id.* at 623–25. Both alibi witnesses admitted having two prior convictions and one of the alibi witnesses did not have any direct knowledge of Washington's whereabouts around the time of the robbery. *Id.* at 625, 633–34. Following his conviction for his involvement in the robbery, Washing-

ton filed a postconviction motion, alleging ineffective assistance of counsel. *Id.* at 625.

¶ 53. At the *Machner* hearing, Washington testified that he had given his attorney the names of several alibi witnesses well in advance of trial. *Washington*, 219 F.3d at 626. Two of these alibi witnesses also testified at the hearing, claiming to have been with Washington on the day of the robbery. *Id.* Washington's counsel admitted that Washington had given him the name of one of the alibi witnesses well in advance of trial, but he had never interviewed the witness and did not give the sheriff a subpoena for the witness until two days before her scheduled testimony and by that point she had left town. *Id.* at 625. The trial court found nothing wrong with Washington's representation at trial, we affirmed and our supreme court denied review. *Id.* at 626–27. Washington filed for a writ of habeas corpus, which the federal district court granted. *Id.* at 627. The State appealed that decision to the Seventh Circuit. *Id.*

¶ 54. The Seventh Circuit determined, as we have here, that Washington's trial counsel's failure to investigate and call to testify the corroborating alibi witnesses constituted deficient performance. *See id.* at 631–32. The court also held that such deficient performance prejudiced Washington's defense. *Id.* at 634–35. The court teaches us that when determining whether trial counsel's performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," we must assess "the totality of the omitted evidence" and the "totality of the evidence before the . . . jury." *Id.* (citations omitted). *See also Thiel*, 264 Wis. 2d 571, ¶ 80 ("The key question . . . is whether the evidence that was omitted . . . due to the deficiencies in counsel's

performance undermined confidence in the outcome of the case, given the totality of the evidence that was adduced at . . . trial.").

¶ 55. In applying this standard the court looked at both the State's and Washington's cases. *Washington*, 219 F.3d at 633–34. The court concluded that the State's case against Washington was "far from unassailable" and noted that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 633 (citation omitted).

¶ 56. The court then moved on to Washington's case, stating that if the case his counsel had presented was the best case, the conviction would have stood on solid ground. *Id.* According to the court, "Washington's defense was crippled" by the fact that he had only the weak corroborating testimony of two alibi witnesses with two prior criminal convictions, one of whom had no direct knowledge of Washington's whereabouts. *Id.* at 633–34.

¶ 57. The court pointed out that the other potential alibi witnesses were with Washington around the time the robbery occurred. *Id.* at 634. The Seventh Circuit court rejected this court's conclusion that the impact of three more witnesses corroborating Washington's alibi would have been cumulative. *Id.* According to the Seventh Circuit, the additional testimony of the alibi witnesses—none of whom could have been impeached as having a criminal record—would have added a great deal of substance and credibility to Washington's alibi. *Id.* "Rather than one direct alibi witness with a criminal record, Washington could have had three potentially more credible witnesses, *all* of whom would have supported his claim that he was [elsewhere] when the [tavern] was robbed." *Id.*

658

¶ 58. Applying this standard, we look to both the State's and Cooks' cases at trial. As in *Washington*, the State's case against Cooks had many weaknesses and thus was readily susceptible to being affected by errors. Other than the authorities who testified, each of the State's witnesses had criminal convictions. Further, many of them had at some point recanted their identifications of Cooks as one of the robbers.

¶ 59. Metz had serious credibility issues. Metz testified that she had five criminal convictions. She twice contacted the authorities—the police and later the district attorney—and recanted her identification of Cooks. During her testimony Metz even suggested that a particular conversation did not occur simply because it was not recorded:

> [Barth]: And during that conversation [with Cooks' sister], didn't you indicate that you were—you made a mistake and that Eric was innocent?
>
> [Metz]: No.
>
> [Barth]: You never said that?
>
> [Metz]: No. Is it recorded?
>
> [Barth]: I didn't say whether it was recorded. I asked if you made the statement.
>
> [Metz]: Okay. Then I didn't.
>
> [Barth]: Because it's not recorded?
>
> [Metz]: Well, you don't have proof of it, so I don't know why you're bringing it up. It has nothing to do with this. And why would I say that?
>
> [Barth]: I'm asking you if you did say it.
>
> [Metz]: And I'm telling you I didn't.

¶ 60. Davis, who had not seen Cooks before, did identify Cooks from a photo array. However, Metz had told Davis that Cooks committed the robbery. Furthermore, the fact that Davis had four previous convictions and was in prison at the time of the trial cast doubt on his credibility. Lakeisha Cooks testified that she saw Cooks leave their mother's house on the night of the robbery with two other men. However, Lakeisha Cooks could not place Cooks directly at the crime scene and none of the other alibi witnesses testified that Lakeisha was present at their mother's house on the night of the robbery. Further, Lakeisha Cooks admitted having been twice convicted of a crime.

¶ 61. The trial court, in rejecting Cooks' ineffective assistance of counsel claim, highlighted both Marshall's and Gross' testimony. Marshall, in his initial statements to police, clearly identified Cooks as one of the robbers. However, Marshall, who was serving a sentence in state prison and had *eleven* criminal convictions, recanted the portions of his statements in which he named Cooks. He testified that he made the statements because Metz had told him Cooks committed the robbery. Gross also recanted the most incriminating of the statements she had made to police—that Cooks told her he was angry because he had robbed some people and did not get anything in return.

¶ 62. Here, as in *Washington*, Cooks' defense was crippled. The theory of the defense was misidentification, which rested both on the weaknesses of the State's case *and* on Cooks' assertion that he was at his mother's home when the robbery took place. Although Cooks testified to his whereabouts on the night of the robbery, Cooks admitted having eight criminal convictions and his own testimony went uncorroborated. Without the corroborating testimony of the alibi witnesses, Cooks' own testimony has the appearance of being self-serving.

¶ 63. The potential alibi witness would have added a great deal of substance and credibility to Cooks' alibi. The affidavits and hearing testimony of the potential alibi witnesses are generally consistent in their recitation of the events of the night of the robbery and are consistent with Cooks' own testimony. As Cooks argues, had they testified, the witnesses would have provided the jury with a timetable showing it was physically impossible for Cooks to have committed the crime. Further, at least Mehring, and perhaps other of the witnesses, could not have been impeached as having a criminal record. We recognize that the witnesses are largely friends or acquaintances and relatives, but this alone does not eliminate the prejudicial effect of leaving corroborative evidence *entirely* unintroduced. *See id.* at 634 ("[T]he mere fact that some negative evidence would have come in with the positive does not eliminate the prejudicial effect of leaving corroborative evidence unintroduced.").

¶ 64. Given the absence of any witnesses, the jury had good reason to find Cooks' alibi dubious. The credibility of Cooks' statements was further weakened by Barth's failure to even raise the issue in his closing arguments. As the trial court recognized, the deliberating jury sent the court a note requesting evidence on the distance between Cooks' mother's house and Metz' house and by doing so, it was signaling its concerns with Cooks' uncorroborated alibi defense.[3]

¶ 65. Having reviewed the totality of the omitted evidence and the totality of the evidence before the jury, we hold that Barth's unprofessional errors were preju-

[3] During its deliberations, the jury sent a note to the judge asking for "the distance between Cooks' mom's house and [Metz'] house to establish time frame." The court informed the jury that it would have to use its collective memory.

dicial to Cooks. Barth's deficient performance undermines our confidence in the outcome of the trial. *See Thiel*, 264 Wis. 2d 571, ¶¶ 80–81. There is a reasonable probability that the result of the proceedings would have been different had the jury heard *all* of Cooks' evidence. *See id.* All Cooks had to do was establish a reasonable doubt, and having additional, potentially more credible alibi witnesses would have covered a lot of ground toward that goal. *See Washington*, 219 F.3d at 635. Because we conclude that Cooks has prevailed on his ineffective assistance of counsel claim, we remand the case to the trial court for a new trial.

## Conclusion

¶ 66. In sum, we reject Cooks' ineffective assistance of counsel claims with regard to Barth's failure (1) to object to the court sending the police reports to the jury room, (2) to prevent the circumstances of Metz' miscarriage from coming into evidence, and (3) to object to Marshall's testimony that he knew Cooks from jail. We affirm the portions of the trial court's order denying postconviction relief that pertain to these three issues. However, we hold that Barth's failure to pursue an alibi defense by investigating potential alibi witnesses, calling those witnesses to testify and raising the alibi question in his closing arguments constituted ineffective assistance of counsel. We further conclude that Barth's deficient performance prejudiced Cooks' defense. Accordingly, we reverse the judgment of conviction and the postconviction order to the extent it holds otherwise and remand the case for a new trial.

*By the Court.*—Judgment reversed; order affirmed in part, reversed in part and cause remanded.