STATE of Wisconsin, Plaintiff-Respondent,

v.

John Francis FERGUSON, Defendant-Appellant.†

Court of Appeals

*No. 2013AP99. Submitted on briefs April 1, 2014.
—Decided April 22, 2014.*

**2014 WI App 48**

(Also reported in 847 N.W.2d 900.)

† Petition to review denied September 25, 2014.

253

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Amelia L. Bizzaro* of *Bizzaro Law LLC*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Sally L. Wellman*, assistant attorney general.

Before Fine, Kessler and Brennan, JJ.

¶ 1. FINE, J. John Francis Ferguson appeals the circuit court's order denying his post-sentence motion to withdraw his 1995 guilty plea.[1] He claims that the circuit court erroneously evaluated his proffered "new evidence," (the recantation of persons who said that he killed a man). He also seeks to withdraw his plea "in the interest of justice." We affirm.

## I.

¶ 2. In 1995, the State charged Ferguson with first-degree intentional homicide for shooting Rickey Hardin following a dispute outside a Milwaukee record store on January 2, 1995. According to the criminal complaint, Ferguson, Corry Spencer, Jason Taylor, William Greene, Corey Hopgood, and Hardin were at the store.[2] As material, the criminal complaint alleged that Taylor, who was then seventeen, told the police that Ferguson angrily confronted Hardin and shot him in the chest with what the complaint described as a "black big framed 9mm pistol." Taylor also told the police that Spencer pulled what the complaint described as a "short 9mm pistol" when Ferguson "pulled his pistol up." According to the complaint, Spencer "was just raising and pointing his gun as Rickey [Hardin] fell to the pavement." The complaint added that "Taylor heard a number of other shots as he ran back into the store," and that he "believes they were from two different

[1] John Francis Ferguson pled guilty in front of and was sentenced by the Honorable Maxine A. White. The Honorable David Borowski denied Ferguson's motion to withdraw that plea.

[2] Spencer's name is spelled in various ways in the Record. When he testified at the post-conviction evidentiary hearing, however, he spelled it "Corry." So will we, except where it is spelled differently in a quotation.

257 .

guns." After the shots stopped, Taylor came out of the store and both Spencer and Ferguson were gone. Taylor and Greene testified at Ferguson's preliminary examination in front of a circuit court commissioner.

¶ 3. Taylor told the commissioner that he, Ferguson, and Spencer were in the record store when they saw Hardin's car outside. Taylor testified that Spencer confronted Hardin and Ferguson "just pulled out a gun and shot" Hardin with a ".9 millimeter" "automatic." According to Taylor, Hardin fell down and he, Taylor, went back into the record store, when he heard more gunshots. He testified that Ferguson was the only person he saw with a gun that day, which was contrary to the complaint's assertion that he said that he also saw Spencer with a gun.

¶ 4. Greene testified that he, Hardin, and Hopgood arrived at the record store that day with Hardin, in Hardin's car, to go to a recording studio that was "[r]ight upstairs." He said that the Ferguson group confronted them as they approached the doorway leading to the studio. He testified that he and Hopgood were already through the doorway when he, Greene, "heard a gunshot." Greene said that he ran upstairs and hid in a closet, and that someone "stuck the gun" in the closet. He did not know who was holding the gun. He testified that he tried to get out of the closet when "the gun went off," and a bullet hit him in his arm. Greene also testified that when he ran into the record store he saw "[h]ysterical" Hopgood, who "was walking around holding his back saying he got shot in the back."

¶ 5. The commissioner bound Ferguson over for trial, and several months later the case was plea-bargained. Ferguson pled guilty to, as recited by the circuit court at the plea hearing, "first degree reckless homicide, while using a dangerous weapon, as party to

a crime." After assuring itself that Ferguson's guilty plea was knowing and voluntary, the circuit court asked Ferguson's lawyer whether there were "any facts you want to explore with the court today on Mr. Ferguson's behalf." Ferguson's lawyer said that "we concede that my client was involved in the shooting of Mr. Hardin," and added that Ferguson knew "Hardin to be a person who had used firearms before," and that "Hardin and Cory Spencer, one of the other persons that my client was with, had been involved in gun battles." The lawyer added: Ferguson "knew that there was extremely bad blood between those individuals. And that he acted recklessly when he shot the weapon." (Paragraphing altered.)

¶ 6. The circuit court then spoke to Ferguson: "[Y]our counsel made a statement about the facts, and you talked [earlier in the plea-hearing] about having reviewed the criminal complaint. Are you in agreement with the summary version of the facts that your lawyer just made to the court?" (Paragraphing altered.) Ferguson replied: "Yes, your Honor." The circuit court also asked Ferguson: "Are there any particular facts that you recall reading in the criminal complaint that you disagree with?" Ferguson replied: "No, your Honor." Ferguson also told the circuit court that it could rely on the facts alleged in the criminal complaint and on the testimony at the preliminary examination in accepting his plea. As noted, Ferguson pled guilty.

¶ 7. At sentencing, Ferguson's lawyer explained that Ferguson was truly remorseful, and that in preparing the case the lawyer initially had "reason to believe that an alibi was possible in this case," but that he later "determined that there really was nothing that could be used for alibi purposes." Indeed, Ferguson's trial lawyer

259

had filed a notice of alibi. Thus, the lawyer told the circuit court, "it was my client's decision that he wanted to resolve the case and accept his responsibility for his conduct[,] which he has done." In his allocution, Ferguson told the circuit court that he was afraid of the victim and that he, Ferguson, "couldn't believe what, you know, what I had done." He also apologized to Hardin's mother, who was in court. Ferguson appealed, and we affirmed on a no-merit brief submitted by his lawyer. *State v. Ferguson*, 1996AP1164–CRNM, unpublished op. and order (WI App Oct. 1, 1996).

¶ 8. Ferguson filed a *pro se* motion dated December 12, 2005, with our court seeking reinstatement of his "direct appeal," claiming various violations of the no-merit procedure. He also filed with the circuit court on December 19, 2005, a *pro se* motion to withdraw his guilty plea, as stated by the circuit court's order of December 21, 2005, denying the motion, "on grounds that the court did not inform him [that] it was not bound by the plea agreement in violation of *State v. Hampton,* 274 Wis. 2d 379, 683 N.W.2d 21 (2004)." We affirmed the circuit court's order on July 31, 2007, and the supreme court denied review. *State v. Ferguson*, No. 2006AP225, unpublished slip op. (WI App July 31, 2007), *rev. denied* 2008 WI 19, 307 Wis. 2d 293, 746 N.W.2d 810. We did, however, grant his subsequent motion for reconsideration. These proceedings followed, and the circuit court held two evidentiary hearings on Ferguson's motion to withdraw his guilty plea. Ferguson was represented by counsel at those hearings and on this appeal.

¶ 9. Ferguson's motion to withdraw his guilty plea contended, as he does on appeal, that the recantation of two witnesses to the confrontation at the record store in 1995 is newly-discovered evidence that requires that he

be allowed to withdraw his guilty plea. One of the witnesses was Taylor, who, as we have seen, was quoted in the criminal complaint as saying that Ferguson shot Hardin, and also testified to that at Ferguson's preliminary examination. The other witness, Spencer, was not quoted in the criminal complaint, but the Record has an affidavit executed by a Milwaukee police detective that avers that Spencer told the police that he saw Ferguson pull a gun and shoot Hardin.

¶ 10. At the first evidentiary hearing, Ferguson's lawyer told the circuit court that Spencer and Taylor had submitted affidavits in support of Ferguson's motion, and represented that Spencer's affidavit averred that Ferguson "was not present" when Hardin was shot, and "[t]hat the name of the shooter is a guy named Raylon Randolph, also known as Mike Mike." Ferguson's lawyer added that Spencer's affidavit also averred: "That they blamed Mr. Ferguson because Mr. Taylor didn't like Mr. Ferguson. And he looked like Mr. Randolph. And Mr. Randolph was Mr. Spencer's best friend. He didn't want him to get into trouble." According to Ferguson's lawyer, "[i]n 2008, [Spencer] decided to clear his conscience. And he got in touch with my client's brother. And he decided to write out his own affidavit." The lawyer also indicated that "Taylor wrote a similar statement back in 2008" asserting that "he didn't see who the shooter was." Although both affidavits were received into evidence, neither Spencer's affidavit nor Taylor's affidavit is in the appellate Record, even though it was Ferguson's responsibility to ensure that the Record before us was complete. *See Fiumefreddo v. McLean*, 174 Wis. 2d 10, 26, 496 N.W.2d 226, 232 (Ct. App. 1993). Nevertheless, we have their testimony, and the lawyers read parts of the affidavits at the hearings.

¶ 11. Corry Spencer testified at the first evidentiary hearing. He testified that his earlier version of what happened back in 1995 was not true, and that he had gone to the record store with Randolph and Taylor. He said that he lied in his earlier recounting of what happened that day "[b]ecause I was pressured into it." He told the circuit court that Randolph, rather than Ferguson, shot Hardin. He also told the circuit court that he spoke to Randolph, with whom he was "good friends," the night of the murder, and that he felt threatened by Randolph. He said that he also spoke to Taylor the night of the murder, and that they agreed "to protect Mike Mike" (Randolph) and blame Ferguson. He testified that he did so "[b]ecause I was scared. I was threatened at the time."

¶ 12. Spencer also testified that he decided to come forward in 2008 because he wanted to clear his "conscience." He described how he wrote his "affidavit."

> I — I wrote a draft first. I sit down and wrote up this saying what happened in my words. I met up with Billie, John [Ferguson]'s brother. First I wrote it up by pencil first, then I typed it up. Me and him went and had it notarized by a notary public."

He denied that anyone told him what to write.

¶ 13. On cross-examination by the State, Spencer admitted that when he was brought to court from the prison where he was then incarcerated, he and Ferguson were in the same jail dormitory. He denied, however, discussing his testimony with Ferguson. Spencer admitted that he knew that Randolph had died "around '96." He explained on cross-examination that he did not contact either Ferguson or a lawyer to say that he had lied when he accused Ferguson of killing Hardin be-

262

cause "I was a kid then," and "[b]ecause it wasn't at the top of my category at that time."

¶ 14. Jason Taylor was thirty-four when he testified at the adjourned evidentiary hearing on Ferguson's motion to withdraw his guilty plea. He told the circuit court that his preliminary-examination testimony that Ferguson shot Hardin was false. Contrary to Spencer's testimony at the evidentiary hearing, however, Taylor said that Ferguson *was* with him and Spencer that day at the record store.

¶ 15. Taylor claimed that he testified falsely at the preliminary examination because "I was getting threats." He also said that he did not like Ferguson. He testified, contrary to his preliminary-examination testimony, that he did not see *who* shot Hardin. But, as the prosecutor pointed out during his cross-examination, Taylor's affidavit submitted in support of Ferguson's motion to withdraw his guilty plea said that Randolph shot Hardin: " 'Then Mike Mike pulled up a black nine millimeter automatic gun and shot Rickey Hardin in the chest one time.' " Taylor explained this by saying that he did not write the affidavit, and did not read it before he signed it, adding that Randolph "probably did it, but I didn't see him do it."

¶ 16. Taylor also claimed that the police tricked him into identifying Ferguson as the person who shot Hardin, and that he said that Ferguson killed Hardin because he was being threatened by Hardin's family. Taylor's affidavit also contradicted his testimony at the evidentiary hearing and at the 1995 preliminary-examination hearing before the court commissioner that Ferguson was with them that day when it averred, as it was read into the Record by the State, " 'John Ferguson was not with Corey Spencer and I on this day.' " On re-direct examination, Taylor explained the

discrepancies by saying that he told the person who wrote the affidavit "what happened; and, you know, they supposedly wrote it out like I explained it. But it's a lot of stuff in there that's, you know, kind of mixed up I guess."

¶ 17. Ferguson also called an investigator hired by one of his lawyers who testified that she called Taylor to verify the assertions in Taylor's affidavit and that when she read the affidavit to him over the telephone he did not have any changes to make. When she later met with Taylor in person, he told her, according to her testimony, "that he didn't really see what happened" the day Hardin was shot, and that he had not seen who shot Hardin. As noted, Taylor's "affidavit" is not in the appellate Record, although it was received as an exhibit during the evidentiary hearing.

¶ 18. Ferguson's brother Willie Anderson also testified at the evidentiary hearing on Ferguson's motion to withdraw his guilty plea. He told the circuit court that he met Spencer in 2008 and Spencer said that he had information that would help Ferguson. He denied telling Spencer what to say in Spencer's affidavit. After he and Spencer got the affidavit notarized, Anderson mailed it to Ferguson. In response to questions by the circuit court, Anderson said that a friend of his who was dating Spencer's mother called him to say that Spencer might have something that would help Ferguson.

¶ 19. Anderson testified that he also met Taylor, who told him that "[h]e wanted to get some stuff off his chest. He told me about my brother John." Anderson testified that he told Taylor to write something up, and that he, Anderson, would "see about giving it to my brother John or his lawyer or whoever I need to get it to." He denied telling Taylor what to say.

¶ 20. Finally, Ferguson testified at the adjourned evidentiary hearing. He told the circuit court that before he pled guilty, his trial lawyer showed him Spencer's and Taylor's statements, and that he agreed to plead guilty as a result: "By the advice of my attorney and what statement where he had witnesses on me that was going to say I did this crime and that I get a lesser sentence than life imprisonment." He said that after his brother had given him the Spencer and Taylor recantation affidavits, he gave them to his lawyer.

¶ 21. Ferguson testified that he pled guilty because he thought, based on what his lawyer told him, "I was going to get, ten years." (Comma in original.) According to the plea colloquy before the circuit court, the plea bargain was that in return for Ferguson's guilty plea to the lesser charge, the State promised to recommend "substantial incarceration in the state prison system." The circuit court at the plea hearing explained to Ferguson that the amended charge "has a maximum penalty of up to forty years in prison, and there is a penalty enhancer for using a dangerous weapon which could increase the maximum by another five years for a total of forty-five years exposure on this amended charge." The circuit court also told Ferguson that the State "intends to recommend substantial imprisonment; that it does not intend to set a number of years before the court, but that it does intend to argue the facts and ask for substantial incarceration." The circuit court then asked: "Is that your understanding, Mr. Ferguson, of the negotiations as well?" Ferguson replied: "Yes, your Honor." The circuit court sentenced Ferguson to thirty-five years in prison.

¶ 22. At the evidentiary hearing on Ferguson's motion to withdraw his guilty plea, the circuit court

asked Ferguson why he would admit at the plea hearing to killing Hardin when he now claimed that he did not. Ferguson responded: "You put yourself in my position and if your attorney not doing the investigation, A, you got a hard choice to make, you got to make them fast. So that's the choice I accepted. I made that choice." Then, Ferguson added: "Is that good enough for you? I'm telling you the truth." The circuit court said in response, "No. Mr. Ferguson, actually — [Ferguson interjected "That's all — "] I don't believe a word you're saying."

¶ 23. As noted, the circuit court denied Ferguson's motion to withdraw his guilty plea, concluding that Taylor's and Spencer's recantations were incredible as a matter of law and were not corroborated. Thus, the circuit court did not reach the issue of whether there was a "reasonable probability" that a jury would acquit if there were a trial. We apply the circuit court's conclusions in the context of the governing law.

## II.

¶ 24. As noted, Ferguson seeks to withdraw his 1995 guilty plea, long after the circuit court sentenced him to thirty-five years in prison, and has proffered recantations by Taylor and Spencer as newly-discovered evidence that warrants withdrawal. He relies essentially on the principles set out in *State v. McCallum*, 208 Wis. 2d 463, 561 N.W.2d 707 (1997), and *State v. Kivioja*, 225 Wis. 2d 271, 592 N.W.2d 220 (1999). *McCallum* assessed standards applicable to a defendant who seeks to withdraw a plea leading to conviction when the motion to withdraw the plea is made after

sentencing.[3] *McCallum*, 208 Wis. 2d at 468, 561 N.W.2d at 708. *Kivioja* assessed standards applicable to a defendant who seeks to withdraw a plea leading to conviction when the motion to withdraw the plea is made before sentencing. *Kivioja*, 225 Wis. 2d at 274, 592 N.W.2d at 223. The distinction, of course between the ultimate applicable standards is that "[a]fter sentencing, a defendant who seeks to withdraw a guilty or no contest plea carries the heavy burden of establishing, by clear and convincing evidence, that withdrawal of the plea is necessary to correct a manifest injustice." *McCallum*, 208 Wis. 2d at 473, 561 N.W.2d at 710. When, however, a defendant seeks to withdraw a plea *before* sentencing, he or she need only show a "fair and just" reason. *Kivioja*, 225 Wis. 2d at 283, 592 N.W.2d at 227. Here, of course, Ferguson falls within the "manifest injustice" test. Nevertheless, Ferguson in essence seeks to have us apply standards set out in *Kivioja* rather than the standards set out in *McCallum*. Analyzing *McCallum* and *Kivioja*, however, we see that in the context of this case there is no meaningful distinction between the two opinions—other than, of course, one applies the law to a post-sentence request to withdraw a plea (the situation we have here), the other applies the law to a pre-sentence request to withdraw a plea, which we do not have here.

---

[3] The plea in *State v. McCallum*, 208 Wis. 2d 463, 561 N.W.2d 707 (1997) was a so-called "*Alford* plea." *See North Carolina v. Alford*, 400 U.S. 25 (1970) (accepting conviction despite contention of innocence); *State v. Garcia*, 192 Wis. 2d 845, 857–858, 532 N.W.2d 111, 115–116 (1995) (*Alford* pleas are permitted in Wisconsin.). *McCallum* noted that the post-sentence standard of "whether there is a reasonable probability that a jury, looking at both the accusation and the recantation, would have a reasonable doubt as to the defendant's guilt" applied to all types of pleas leading to conviction. *McCallum*, 208 Wis. 2d at 474, 561 N.W.2d at 711.

## A. *McCallum*

> For newly discovered evidence to constitute a manifest injustice and warrant the withdrawal of a plea the following criteria must be met. First, the defendant must prove, by clear and convincing evidence, that: (1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative. If the defendant proves these four criteria by clear and convincing evidence, the circuit court must determine whether a reasonable probability exists that a different result would be reached in a trial. Finally, when the newly discovered evidence is a witness's recantation, we have stated that the recantation must be corroborated by other newly discovered evidence.

*McCallum*, 208 Wis. 2d at 473–474, 561 N.W.2d at 710–711. No one here asserts that Ferguson has not met the four initial hurdles. Thus, under *McCallum*, the issue resolves to: (1) whether the recantation was corroborated by other newly-discovered evidence; and, if so, (2) whether a "reasonable probability exists that a different result would be reached in a trial." *Id.* at 473. The circuit court did not reach that second issue because it concluded that the recanting witnesses (Taylor and Spencer) were incredible as a matter of law. Under *McCallum* that conclusion *ipso facto* precludes a determination that a different result would be reached in a trial. *Id.*, 208 Wis. 2d at 475, 561 N.W.2d at 711 ("A finding that the recantation is incredible necessarily leads to the conclusion that the recantation would not lead to a reasonable doubt in the minds of the jury.").[4]

---

[4] As *McCallum* observes, a mere finding that the recanting witness was "less credible than the original accusation" does not answer whether a different result would be reached in a trial because "[a] reasonable jury finding the recantation less cred-

¶ 25. Further, *McCallum* was quite adamant in requiring that the newly-discovered evidence "must be corroborated by *other newly discovered evidence.*" *Id.*, 208 Wis. 2d at 476, 477, 561 N.W.2d at 712 (emphasis added). There is such corroboration if: "(1) there is a feasible motive for the initial false statement; and, (2) there are circumstantial guarantees of the trustworthiness of the recantation." *Id.*, 208 Wis. 2d at 478, 561 N.W.2d at 712. Among the factors that may lead to a conclusion that "there are circumstantial guarantees" that the recantation is trustworthy are: (1) "[t]he recantation is internally consistent"; (2) "the recantation is consistent with circumstances existing" when the recanting witness made his or her initial charge; and (3) whether the recanting witness knows that he or she could suffer criminal consequences stemming from the earlier false accusation. *Id.*, 208 Wis. 2d at 478, 477, 561 N.W.2d at 712.

¶ 26. Chief Justice Shirley S. Abrahamson concurred in *McCallum*, and Ferguson contends that because, as we will see, *Kivioja* (the pre-sentence case) adopted parts of that concurrence, *Kivioja*'s adoption of the concurrence should govern the result of this case. We thus look at the concurrence. The chief justice wrote:

> I agree with the mandate but write separately to elaborate on the two major issues I believe are raised in the present case. The first is the standard of review

ible than the original accusation could, nonetheless, have a reasonable doubt as to a defendant's guilt or innocence. It does not necessarily follow that a finding of 'less credible' must lead to a conclusion of 'no reasonable probability of a different outcome.' Less credible is far from incredible." *McCallum*, 208 Wis. 2d at 474–475, 561 N.W.2d at 711.

applied by an appellate court to a circuit court's denial of a motion for a new trial based on recantation testimony. The second is the legal standard a circuit court applies to determine whether there is a reasonable probability of a different outcome were the fact finder to hear the evidence presented at the initial proceeding and to hear the recantation and other new evidence.

*McCallum*, 208 Wis. 2d at 480–481, 561 N.W.2d at 713 (Abrahamson, C.J., concurring). With respect to the standard of review, the concurrence opined that the first two elements of the newly-discovered evidence test (the evidence was discovered after conviction and the defendant was not negligent in failing to discover it earlier) should be evaluated by an appellate court on whether the circuit court's findings were "clearly erroneous." *Id.*, 208 Wis. 2d at 486, 561 N.W.2d at 716 (Abrahamson, C.J., concurring). It opined that the standard of appellate review in connection with the second two elements of the newly-discovered evidence test (the evidence is both material and not cumulative) should be evaluated by an appellate court as to whether the circuit court erroneously exercised its discretion. *Id.*, 208 Wis. 2d at 487, 561 N.W.2d at 716 (Abrahamson, C.J., concurring). In connection with the fifth element, namely, "whether a reasonable probability exists of a different result when a jury considers both the evidence in the initial proceeding and the recantation and other new evidence," the concurrence opined:

[T]he circuit court must make two determinations.

First, the circuit court makes a preliminary threshold determination about the credibility of the recanting witness, that is, whether the witness is worthy of belief by the jury. Second, *if the recantation is not incredible,*

270

the circuit court determines whether a reasonable probability exists of a different result at a new trial.

The first step is for the circuit court to determine whether the recantation is credible, that is, worthy of belief. The circuit court does not determine whether the recantation is true or false. Such a holding would render meaningless the right to have a jury determine the ultimate issue of guilt based on all the evidence. *The circuit court merely determines whether the recanting witness is worthy of belief, whether he or she is within the realm of believability, whether the recantation has any indicia of credibility persuasive to a reasonable juror if presented at a new trial.*

*Id.*, 208 Wis. 2d at 487, 561 N.W.2d at 716 (Abrahamson, C.J., concurring) (footnote omitted) (emphases added). The concurrence agreed with the Majority, however, that a circuit court's conclusion that the recanting witness was incredible as a matter of law essentially ends the inquiry as to whether the defendant could withdraw the plea: "A circuit court's finding that a recanting witness is incredible as a matter of law is sufficient to support its conclusion that no reasonable probability exists of a different result at a new trial." *Id.*, 208 Wis. 2d at 487–488, 561 N.W.2d at 716 (Abrahamson, C.J., concurring).[5] Further, Chief Justice Abrahamson recognized that, "[a]n appellate court should not upset a finding of credibility unless it is clearly erroneous," because "the circuit court is in a much better position than an appellate court to resolve

[5] "Once a circuit court finds that a recanting witness is credible, then it must decide whether the defendant has satisfied the crux of the fifth element: whether a reasonable probability exists of a different result in a new trial." *State v. McCallum*, 208 Wis. 2d 463, 488, 561 N.W.2d 707, 716–717 (1997) (Abrahamson, C.J., concurring).

whether the witness is inherently incredible." *Id.*, 208 Wis. 2d at 488, 561 N.W.2d at 716 (Abrahamson, C.J., concurring).

¶ 27. Although, as we have seen, the circuit court here based its denial of Ferguson's motion to withdraw his plea on its finding that Taylor's and Spencer's recantations were incredible as a matter of law, and thus, under the view of all the justices in *McCallum*, it did not have to reach (and did not reach) whether there was a reasonable probability of a different result at any new trial, Ferguson relies on the concurrence's analysis of that "reasonable probability" element. Accordingly, Ferguson is fighting a battle that he cannot win because, as we show below, the circuit court did not erroneously exercise its discretion in determining that Ferguson's recantation witnesses were incredible as a matter of law.

B. *Kivioja*

¶ 28. *Kivioja*, as we have seen, was a *pre-sentence* plea-withdrawal case. Thus, the "manifest injustice" test did not apply. *Kivioja*, 225 Wis. 2d at 283, 592 N.W.2d at 227 ("A defendant seeking to withdraw a plea of guilty or no contest before sentencing must show that there is a 'fair and just reason,' for allowing him or her to withdraw the plea."). Accordingly, contrary to what we have seen are two of the factors that apply when a defendant seeks to withdraw a plea after sentencing, a defendant in the pre-sentence environment does not have to show that the recantation is corroborated or that there is a "reasonable probability that a jury, looking at both the accusation and the recantation, would have a reasonable doubt as to the defendant's guilt." *Id.*, 225 Wis. 2d at 285, 592 N.W.2d at 228 (relying on *McCallum*). Retaining some of the

elements recognized by *McCallum*, *Kivioja* established the framework for a pre-sentencing plea withdrawal:

> New evidence should constitute a fair and just reason where the defendant shows by a preponderance of the evidence that (1) the evidence was discovered after entry of the plea; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative. These first four requirements will not unduly burden a defendant offering recantation evidence as a recantation by its nature generally satisfies these criteria.

*Kivioja*, 225 Wis. 2d at 294, 592 N.W.2d at 231–232. *Kivioja* modified the *McCallum* approach with respect to the remaining factors when the defendant seeks to withdraw his or her pre-sentence plea. We quote *Kivioja* at some length because, as noted, Ferguson relies on its adoption of Chief Justice Abrahamson's *McCallum* concurrence.

> In addition to meeting these four criteria, when the newly discovered evidence is a witness's recantation as it is here, the circuit court must determine that the recantation has reasonable indicia of reliability.
>
> *The test we adopt differs from the more onerous McCallum test in significant ways.* First, a defendant will be held to demonstrate a fair and just reason for withdrawal of a plea by a preponderance of the evidence, less demanding than the clear and convincing standard required of a similar motion made after sentencing. Second, a defendant need not show that there is a reasonable probability of a different result at trial. Third, a defendant will not need to show other new evidence that corroborates the recantation. In place of this last requirement found in *McCallum*, under the test we articulate here, the defendant will be held to the lesser showing that the recantation has

273

reasonable indicia of reliability—that is, that the recantation is worthy of belief. Should the court find that the first four criteria are met, and that the recantation is worthy of belief, the defendant will have provided a sufficient fair and just reason for withdrawal.

The application of this modified *McCallum* test is justified prior to sentencing because the credibility and the reliability of recantation evidence is crucial to a determination of whether the fair and just reason offered by the defendant actually exists. Regardless of when recantation is offered, its inherent unreliability is static. If a recantation could be found unreliable after sentencing, we do not believe that that same recantation, equally unreliable if offered prior to sentencing, should entitle the defendant resting his or her motion solely on that recantation to plea withdrawal.

*Therefore, the circuit court must properly determine whether the recantation is credible, worthy of belief. McCallum, 208 Wis. 2d at 487, 561 N.W.2d 707 (Abrahamson, C.J., concurring). The circuit court is to determine "whether [the witness] is worthy of belief, whether he or she is within the realm of believability, whether the recantation has any indicia of credibility persuasive to a reasonable juror if presented at a[ ] trial." Id. Of course, should the circuit court find that the recantation is incredible or not worthy of belief, it may deny the defendant's motion to withdraw. See McCallum, 208 Wis. 2d at 487, 561 N.W.2d 707 (Abrahamson, C.J., concurring).* However, if a reasonable jury could believe the recantation, then the defendant is entitled to withdraw his or her plea, for the defendant does not have the added burden of showing that a reasonable jury would have a reasonable doubt about the defendant's guilt, as is required when a motion is made after sentencing.

*Kivioja*, 225 Wis. 2d at 295–296, 592 N.W.2d at 232 (bracketing in *Kivioja*) (emphases added). *Kivioja* thus

reaffirms that it did not change the law controlling post-sentence plea-withdrawal motions. Rather, as it clearly says, it modified the *McCallum* rubric *only* for pre-sentence motions. Accordingly, Ferguson's reliance on a footnote in an unpublished court of appeals decision, *State v. Moore*, No. 2010AP377, unpublished slip op. (WI App Jan. 26, 2012), which concerned a conviction following a trial and a recantation by one of the State's witnesses at that trial, and which applied in part the *McCallum* concurrence in assessing whether the recantation affected the trial's fundamental reliability, *Moore*, No. 2010AP377, unpublished slip op. ¶ 37 n.9, is misplaced.

¶ 29. Here, of course, as we have already seen, the circuit court found Ferguson's recanting witnesses to be incredible as a matter of law. Our review of this finding is whether the circuit court erroneously exercised its discretion. *See McCallum*, 208 Wis. 2d at 473, 561 N.W.2d at 710 ("We will only reverse if the circuit court has failed to properly exercise its discretion. An exercise of discretion based on an erroneous application of the law is an erroneous exercise of discretion.") (internal citation omitted). Thus, the issue boils down to whether the circuit court applied appropriate legal principles.

¶ 30. By determining that the recantations were incredible as a matter of law, the circuit court did not need to separately consider whether there was a reasonable probability that a different result would be reached in a trial because a finding that the recantations are incredible as a matter of law already answers the "reasonable probability" inquiry. *McCallum*, 208 Wis. 2d at 475, 561 N.W.2d at 711 ("A finding that the recantation is incredible necessarily leads to the conclusion that the recantation would not lead to a reasonable doubt in the minds of the jury.").

¶ 31. As *McCallum* tells us, a post-sentence recantation must be corroborated by other newly-discovered evidence. *Id.*, 208 Wis. 2d at 476–477, 561 N.W.2d at 711–712. As noted, this can be done by showing that: "(1) there is a feasible motive for the initial false statement; and, (2) there are circumstantial guarantees of the trustworthiness of the recantation." *Id.*, 208 Wis. 2d at 478, 561 N.W.2d at 712. We agree with the circuit court that the "motive" for Spencer's alleged initial false statements was not "feasible" because Spencer's alleged fear of Randolph would have dissipated when Randolph died shortly after Ferguson pled guilty, and Spencer did not allege that Randolph's alleged threats might have been carried out by a Randolph disgruntled relative or friend. Further, although the second requirement (circumstantial guarantees of the trustworthiness of the recantation) may be established by, as we have already seen, internal consistency, both Taylor's and Spencer's recantations were woefully inconsistent and inconsistent with each other. Thus, neither served as newly-discovered corroboration of the other.

¶ 32. Contrary to Ferguson's argument, the circuit court did not deny his motion because the circuit court did not personally believe Taylor and Spencer (an issue that would have to be left to the jury), but, rather, because both Taylor and Spencer *were* incredible as a matter of law. The circuit court applied the correct legal principles and did not by any stretch of the imagination, erroneously exercise its discretion.

¶ 33. Ferguson also wants us to reverse in the interests of justice under Wis. Stat. § 752.35 ("In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully

tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from."). His argument, however, merely rehashes contentions that we have already rejected. *See State v. Arredondo*, 2004 WI App 7, ¶ 56, 269 Wis. 2d 369, 405, 674 N.W.2d 647, 663–664. Accordingly, we affirm.

*By the Court.*—Order affirmed.