PER CURIAM.
¶ 1 Ashanti M. Mcalister appeals a judgment, entered upon a jury's verdict, convicting him of first-degree intentional homicide as a party to a crime. He also appeals a post-conviction order that denied his claim for a new trial on the ground that he has newly discovered evidence. We conclude that the circuit court properly denied his post-conviction claim without a hearing. Accordingly, we affirm.
BACKGROUND
¶ 2 In early January 2013, police received a report that Evon Young was missing.[1] The matter became a homicide investigation and, in due course, the State charged Mcalister and several other men with first-degree intentional homicide as a party to the crime of causing Young's death on January 1, 2013. The case against Mcalister proceeded to trial on June 24, 2013, and a jury found him guilty as charged.
¶ 3 At Mcalister's trial, Victor Stewart testified that he was the "general" of the Black P. Stones, a street gang operating in Milwaukee, Wisconsin. He said that on January 1, 2013, he went to the home of Ron Allen, the gang's third-ranking member. There, Stewart said, he drank alcohol and smoked marijuana with Allen, Mcalister-the gang's enforcer and second-in-command-and other gang members, including Devin Seaberry. Eventually, Stewart drove his Impala to the home of his cousin, Billy Griffin, to buy high-grade marijuana that Stewart knew Griffin to sell. Stewart testified that he was accompanied by Mcalister, Allen, and Seaberry, and that Mcalister was armed with a gun he had obtained from another gang member, Bruce Christopher.
¶ 4 Griffin allowed the four men into his home, and the group gathered in the kitchen. Young, who was Griffin's housemate, was also present. Stewart said he then told Griffin that Young had stolen Griffin's property. Following this disclosure, Mcalister used his gun to hit Young multiple times in the face. Mcalister also threatened to shoot Young, but Griffin said to shoot Young "somewhere else." Stewart testified that in response he took the gun and shot into the floor to demonstrate that he, not Griffin and not Mcalister, was "running things."
¶ 5 Stewart testified that the group next went to the basement. There, Allen tried to suffocate Young by putting a plastic bag over his head, but the bag broke. Young then began begging for his life, but Stewart pushed Young away. While Mcalister trained a gun on Young, Allen got a chain and used it to choke Young until he appeared to pass out.
¶ 6 Stewart said he and Griffin went back upstairs to smoke marijuana while Allen left the scene to buy bleach and duct tape and to get a change of clothes. In the basement, Seaberry began "getting the gun ready.... [C]ocking and getting it ready." Stewart said that from his vantage point at the top of the basement stairs, he saw Mcalister pointing the gun, and Stewart then heard three shots.
¶ 7 Stewart testified that Young's body was wrapped in a curtain and a sheet, and when Allen returned to the home, the gang members cleaned the basement with bleach. Stewart emptied the Impala's trunk, and Allen, Seaberry, and Mcalister put Young's body inside. The four men then drove to an apartment complex where Allen, Seaberry, and Mcalister put Young's body in a dumpster. Stewart said he learned from Mcalister that he and Seaberry set fire to the body later that night.
¶ 8 Seaberry also testified. He denied gang membership but acknowledged that he knew Stewart and knew he was the highest ranking member of the Black P. Stones. Seaberry said that he was friendly with Allen and his housemate, Mcalister.
¶ 9 Seaberry said that on January 1, 2013, he went with Stewart, Allen, and Mcalister to Griffin's home, and a "fight ... broke out." Stewart appeared to direct Mcalister and Allen to attack Young, and Stewart then directed Mcalister, Allen, and Young to go to the basement. Seaberry said that he went partly down the stairs to see what was happening, and he observed Allen choking Young. After Allen came back upstairs and said "suffocation didn't work," Seaberry went to the basement and saw Young lying face down. Seaberry testified that Young "looked dead." Seaberry went on to say that while he was standing on the basement stairs, he heard three gun shots. Although Seaberry did not see who fired the gun, Mcalister was the only person in the basement with Young at the time. Seaberry went on to describe how he, Allen, Mcalister, and Stewart drove Young's body away from Griffin's home and put the body in a dumpster.
¶ 10 Bruce Christopher testified that on December 31, 2012, Mcalister took a gun from Christopher's home, saying "we needed" it. On January 2, 2013, Mcalister called Christopher and told him that the gun was in Christopher's car. Mcalister told Christopher to wipe off the gun and put it away.
¶ 11 The State also relied on various items of physical evidence. As relevant here, the State showed that a cell phone was found across the street from Griffin's home in early January 2013. Police traced the telephone number for the phone back to Mcalister. The State also showed that Stewart and his wife owned a silver Impala. Police detected the odor of a cadaver in the Impala's trunk and further investigation revealed that Mcalister's fingerprint was on one of the car's doors.
¶ 12 Also in the record is Allen's testimony from his February 2014 trial for the first-degree intentional homicide of Young. Allen testified that he and Mcalister lived together in late 2012 and 2013, and Allen said that Mcalister hosted a party at their home on January 1, 2013. Allen confirmed that he, Stewart, Mcalister, and Seaberry went to Griffin's home later that day. According to Allen, Stewart was carrying a gun that he fired into the floor of Griffin's home and then transferred to Mcalister. Allen testified that after the gang members went to the basement, Stewart tried but failed to suffocate Young with a bag. When Young broke free and pleaded to live, Mcalister and Allen both beat Young, and Allen then choked Young with a chain for approximately three minutes. Allen stopped because the "body felt lifeless. And [Stewart] told [Allen] to stop at that point." Allen said he left the scene to get cleaning supplies and when he returned, Young was partially wrapped in some kind of material. Allen said he was not present for a shooting in the home, but he later learned that Stewart told Mcalister to shoot Young.
¶ 13 Allen testified that he did what Stewart ordered because Stewart was the general of the Black P. Stones gang, and "if you don't do what you have to from the general, it's possibly death or a serious term of punishment." Allen further testified that the only reason he cooperated in the homicide was his belief that if he did not, he would be "just as dead as well."
¶ 14 The jury in Allen's case rejected the coercion defense. Allen, like Mcalister, was found guilty of first-degree intentional homicide as a party to a crime.
¶ 15 In July 2015, Mcalister filed a post-conviction motion alleging that he had newly discovered evidence warranting a new trial. In support, he submitted an affidavit from Seaberry. Mcalister also submitted an unsworn letter, purportedly signed by Allen. According to Mcalister, his post-conviction counsel had received the letter unsolicited in the mail. Both the affidavit and the letter contain assertions that Mcalister was not present at Griffin's home on the night that Young was killed.
¶ 16 In the affidavit, Seaberry asserted that he testified falsely at Mcalister's trial:
[Mcalister] was not at [the scene] the night Mr. Young was killed. I last saw Mr. [Mcalister] on January 1, 2013 at a party at his house where he lived with Mr. Allen. I left the party with [ ] Allen and [ ] Stewart, but Mr. [Mcalister] did not come with us and stayed at the party. Mr. [Mcalister] was never present at the [scene of the homicide] on the night of January 1 and 2, 2013....
[Mcalister] was not in the basement when I heard the three gunshots and was not at the residence.
I testified at Mr. [Mcalister's] trial that [Mcalister] was present at [Griffin's] house and that [Mcalister] shot a gun in the basement of the house because an agreement was reached among witnesses that Mr. [Mcalister] would take the blame for Mr. Young's murder because [Mcalister] was the youngest person in the group and would face the least punishment if convicted. I was afraid for my own and my family's safety if I did not testify against Mr. [Mcalister].
¶ 17 Similarly, the Allen letter indicated that Allen had testified falsely at his own trial, stating in part:
I was the suspect who killed/strangl[ed] [ ] Young, [Mcalister] had nothing to do with these accusations against him.... [Mcalister] was at our house ... while this [homicide] was being committed. The only reason why [Mcalister's] fingerprints were on the [Impala] was because earlier that day we all went to the liquor store and [Mcalister] sat in the front seat. I told [Mcalister] to stay at home and watch the house because I had a party going on the day of the incident. [Mcalister] was drunk and could not function properly due to the party.... [Mcalister] is not a member of any gang he is just an innocent young man tangled in a web of trouble he was never involved in. I was threatened to incriminate [Mcalister] wrongfully because my family was also threatened by [ ] Stewart!
¶ 18 The State questioned Mcalister's failure to submit an affidavit from Allen. In response, Mcalister filed an affidavit from his counsel asserting that he was unable to contact Allen because Allen was represented by an attorney who would not allow contact. Additionally, Allen's attorney herself filed an affidavit stating that she would not permit an investigator to talk to Allen and further advising that if Mcalister subpoenaed Allen to testify, he would invoke his constitutional right to remain silent.
¶ 19 The circuit court resolved the motion without a hearing. In a written order denying Mcalister a new trial, the circuit court concluded that the witness statements he offered in support of post-conviction relief were not corroborated as the law requires, and, even if deemed corroborated, the statements did not otherwise satisfy the test for newly discovered evidence. Mcalister appeals.
DISCUSSION
¶ 20 The decision to grant a motion for a new trial based on newly discovered evidence rests in the circuit court's discretion. State v. Plude , 2008 WI 58, ¶ 31, 310 Wis. 2d 28, 750 N.W.2d 42. We will affirm a circuit court's exercise of discretion if the decision has a reasonable basis and the circuit court reached its conclusion in accordance with accepted legal standards and the facts of record. See State v. LaCount , 2008 WI 59, ¶ 15, 310 Wis. 2d 85, 750 N.W.2d 780.
¶ 21 A defendant seeking a new trial based on newly discovered evidence " 'must prove, by clear and convincing evidence, that: (1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative.' " State v. Armstrong , 2005 WI 119, ¶ 161, 283 Wis. 2d 639, 700 N.W.2d 98 (citation omitted). If the defendant satisfies these requirements, " 'the circuit court must determine whether a reasonable probability exists that a different result would be reached in a [new] trial.' " Id. (citation omitted). "A reasonable probability of a different outcome exists if 'there is a reasonable probability that a jury, looking at both the old evidence and the new evidence, would have a reasonable doubt as to the defendant's guilt.' " State v. Love , 2005 WI 116, ¶ 44, 284 Wis. 2d 111, 700 N.W.2d 62 (citation and brackets omitted).
¶ 22 In this case, the alleged newly discovered evidence consists of an affidavit and a letter purportedly repudiating prior testimony. "[A] recantation occurs when a witness formally or publicly withdraws or renounces prior statements or testimony." State v. McAlister , 2018 WI 34, ¶ 53, 380 Wis. 2d 684, 911 N.W.2d 77. Accordingly, both the Seaberry affidavit and the Allen letter must be viewed as recantations.
¶ 23 "Recantations are inherently unreliable. The recanting witness is admitting that he or she has lied under oath. Either the original sworn testimony or the sworn recantation testimony is false." See State v. McCallum , 208 Wis. 2d 463, 476, 561 N.W.2d 707 (1997) (internal citation omitted). Therefore, when alleged newly discovered evidence is a recantation, a defendant must satisfy a requirement in addition to the five-factor Armstrong test. Specifically, "recantation testimony must be corroborated by other newly discovered evidence." McCallum , 208 Wis. 2d at 476.
¶ 24 Because Mcalister claims the circuit court erroneously denied him a hearing on his post-conviction motion, an additional analysis is also required. We consider de novo whether a post-conviction motion "on its face alleges sufficient material facts that, if true, would entitle the defendant to relief.... If the motion raises such facts, the circuit court must hold an evidentiary hearing." See State v. Allen , 2004 WI 106, ¶ 9, 274 Wis. 2d 568, 682 N.W.2d 433. If, however, "the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing."See id. We review with deference the circuit court's discretionary decision denying a hearing. See id.
¶ 25 With the foregoing principles in mind, we turn to whether Mcalister sufficiently supported his claim of newly discovered recantation evidence. We begin by considering the corroboration requirement.
¶ 26 The circuit court determined that the Allen letter and the Seaberry affidavit cannot corroborate each other because the Allen letter is unsworn. The circuit court was correct. The rule is long settled that a party seeking a new trial on the basis of recantation evidence must provide sworn affidavits from the recanting witnesses. See Dunlavy v. Dairyland Mut. Ins. Co. , 21 Wis. 2d 105, 114-16, 124 N.W.2d 73 (1963) ; see also State v. Leppere , 66 Wis. 355, 366, 28 N.W. 376 (1886) (stating that an unsworn statement from a recanting witness is, absent an affidavit, "entirely insufficient to authorize any disturbance of the verdict").
¶ 27 Both Mcalister and the State note that the Dunlavy court cited a statute requiring affidavits in support of a motion for a new trial based on newly discovered evidence, see id. , 21 Wis. 2d at 115-16, and both parties recognize that the current statute governing motions for a new trial does not require affidavits, see WIS. STAT . § 805.15 (2015-16).[2] Mcalister therefore contends that there is no validity, indeed, no "persuasive value," to the Dunlavy holding requiring affidavits to corroborate a recantation. We cannot agree. The Dunlavy court stated that the "controlling authority" for the court's holding was an earlier case requiring " 'strict observance' " of the rule requiring affidavits from the witnesses when a party seeks a new trial on the ground of newly discovered evidence. See id. at 115 (citing Dunbar v. Hollinshead , 10 Wis. 447, 451 (1860) ). The reason for the rule was " 'to guard against unfounded applications,' " see Dunlavy , 21 Wis. 2d at 115 (citation omitted), not to satisfy a statutory mandate. Moreover, while the instant appeal was pending, our supreme court cited Dunlavy as a component of the pedigree underlying current analysis of newly discovered recantation evidence. See McAlister , 380 Wis. 2d 684, ¶ 33. Accordingly, we are bound by Dunlavy . See Cook v. Cook , 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997). Mcalister is therefore required to " 'produce the affidavits of the witnesses.' " See Dunlavy , 21 Wis. 2d at 115 (citation omitted). Signed statements are insufficient. See id.
¶ 28 Mcalister contends that, if Dunlavy controls, he can satisfy its mandate because the case provides that the party seeking a new trial based on newly discovered evidence is excused from producing sworn affidavits if the party "satisfactorily show[s] why he cannot do so." See id. In Mcalister's view, he has provided a satisfactory reason for his inability to produce an affidavit from Allen, specifically, the refusal of Allen's counsel to permit Allen to talk to Mcalister. We are not persuaded.
¶ 29 Mcalister's "reason" for not producing an affidavit from Allen turns on concessions that Mcalister has never talked to Allen about the unsworn letter, never confirmed that Allen wrote it, and never secured his acknowledgment that the statements in the letter are true. As the circuit court pointed out, "anyone could have written the letter." Further, the record shows that Allen explicitly advised through his lawyer that he will not testify on Mcalister's behalf. Thus, Mcalister offers, not a reason for failing to provide an affidavit from a corroborating witness, but rather an admission that he lacks such a witness.
¶ 30 Mcalister nonetheless asserts that his newly discovered evidence claim may proceed. In support, he points to McCallum 's holding that "the corroboration requirement in a recantation case is met if: (1) there is a feasible motive for the initial false statement; and (2) there are circumstantial guarantees of the trustworthiness of the recantation." Id. , 208 Wis. 2d at 477-78.
¶ 31 The State suggests that the foregoing holding is an alternative test for use only when newly discovered evidence pertains to a crime lacking third-party witnesses or physical evidence. Cf. id. Our supreme court recently held, however, that a motion for a new trial based on a recantation requires corroboration that satisfies both components of the quoted McCallum formulation. See McAlister , 380 Wis. 2d 684, ¶¶ 57-58. Accordingly, we consider whether the recantations offered here reflect the feasible motive and circumstantial guarantees of trustworthiness that McCallum and McAlister require.
¶ 32 Both the Seaberry affidavit and the Allen letter suggest fear as a motive for the allegedly false trial testimony. Seaberry states that he "was afraid for [his] own and [his] family's safety if [he] did not testify against Mr. Mcalister." The Allen letter states that Allen "was threatened to incriminate [Mcalister] wrongfully because [Allen's] family was also threatened by [ ] Stewart. [Stewart]'s plans were to exclude himself from shooting and possibly finishing off the victim that was murdered."
¶ 33 These allegations are conclusory. See Allen , 274 Wis. 2d 568, ¶ 15. Allen requires that allegations in post-conviction motions be sufficiently specific as to satisfy "the five 'w's and one 'h'; that is, who, what, where, when, why, and how." See id. , ¶ 23. Seaberry does not state in his affidavit what led him to fear for his safety, he does not explain why his fear was reasonable, he does not identify the person or thing that instilled his fear, and he does not name any family members who he believed were at risk. The Allen letter similarly fails to name any family members who were threatened, or how they were threatened, or what they were threatened with, or describe the nature of the threats, or why the threats were credible, or when the threats were made. The allegations were therefore inadequate to support a claim for relief. See id.
¶ 34 Seaberry's affidavit offered a second motive, namely, that Seaberry falsely accused Mcalister at trial "because an agreement was reached among witnesses that Mcalister would take the blame for Mr. Young's murder because [Mcalister] was the youngest person in the group and would face the least punishment if convicted." This alleged motive is similarly conclusory. The affidavit does not identify the witnesses referenced, or explain when they reached an agreement, or where the agreement was made, or how they communicated the agreement among themselves.
¶ 35 Additionally, as the State contends, the alleged agreement does not constitute a feasible motive for Seaberry's testimony against Mcalister. Neither Seaberry nor the other co-actors in this case testified in a way that left Mcalister to "take the blame" for the homicide. Seaberry himself testified at Mcalister's trial that Stewart, Allen, and Mcalister all played significant roles in the crime. Seaberry described Allen suffocating the victim, and Seaberry agreed that while Allen and Mcalister carried out "the actual killing," the homicide was "orchestrated" by Stewart. For his part, Stewart testified that at the time of the homicide he was "running things," that he pushed Young away while he begged for help, and that Young was then strangled by Allen and shot by Mcalister. Allen testified at his own trial that Stewart directed the other gang members to commit the murder, that Stewart ordered Allen to choke Young, and that Allen obeyed. The record is thus abundantly clear that neither Seaberry nor the other witnesses scapegoated Mcalister. Accordingly, Seaberry's affidavit simply does not state a feasible allegation that Seaberry implicated Mcalister in furtherance of a plan to make him "take the blame" for Young's murder.
¶ 36 Moreover, the recantations lack circumstantial guarantees of trustworthiness. In McCallum , the supreme court concluded that a recantation had sufficient circumstantial guarantees of trustworthiness when, inter alia , it was given under oath and the recanting witness was willing to face criminal consequences if the initial allegations were false. See id. , 208 Wis. 2d at 478. The Allen letter, however, is unsworn, and Allen's counsel has affirmatively advised that Allen will not expose himself to any risk if called to testify but instead will invoke his constitutional right to remain silent.
¶ 37 The Seaberry affidavit is a sworn document, but it is undermined by the Allen letter. According to Seaberry, he and his cohorts implicated Mcalister because Mcalister was the youngest person in the gang and therefore would escape the harshest punishment. The Allen letter, however, states that Mcalister "is not a member of any gang. He is just an innocent young man tangled in a web of trouble." Inconsistency in the materials submitted in support of a claim based on a newly discovered recantation demonstrates that the materials lack circumstantial guarantees of trustworthiness.[3] See State v. Ferguson , 2014 WI App 48, ¶ 31, 354 Wis. 2d 253, 847 N.W.2d 900.
¶ 38 In sum, Mcalister failed to satisfy the corroboration requirement imposed for newly discovered recantation evidence. Accordingly, the circuit court properly denied his claim.
¶ 39 Because Mcalister has not satisfied the corroboration requirement, we need not consider any other aspect of the test for newly discovered evidence. Cf. Ferguson , 354 Wis. 2d 253, ¶ 24. For the sake of completeness, however, we also consider the circuit court's conclusion that Mcalister's post-conviction motion and supporting materials failed to demonstrate a reasonable probability that a jury looking at the old evidence and the new evidence would have a reasonable doubt about Mcalister's guilt. See id. We agree with that conclusion.
¶ 40 As we have seen, the original evidence included testimony about the homicide from several co-actors who vividly and consistently described how Mcalister, in concert with Stewart and Allen, committed the crime. Additionally, physical evidence incriminated Mcalister. Against this testimony and evidence, Mcalister now offers a letter that no person admits writing, the contents of which no witness will embrace. He also offers an affidavit from Seaberry, who avers that his original testimony was offered to shift blame for the murder away from other gang members and onto Mcalister, notwithstanding that Seaberry's original testimony blamed other gang members for the crime. Given the strength of the State's case and the inadequacies of the recantations, the circuit court correctly concluded that no reasonable possibility exists that a jury would have acquitted Mcalister if it had heard the substance of Mcalister's newly discovered evidence. Accordingly, we affirm.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

Young was a transgendered person and the record contains references to Young as both male and female. For consistency, we refer to Young as a male throughout this opinion.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The Seaberry affidavit refers to Mcalister as the youngest member of the "group" but Mcalister's briefs in this court and in the circuit court expressly acknowledge that the meaning of this allegation was that Mcalister "was the youngest gang member." Moreover, Mcalister has conceded throughout the post-conviction proceedings that he was a member of the Black P. Stones gang. Indeed, he relies on that membership as a component of his claim for relief. He asserted both in his circuit court submissions and his briefs in this court that his connection to the cell phone found near the murder scene did not show that he was present at the homicide because "there was evidence that the Black P. Stones share phones; so even if the number was registered to Mcalister, the phone does not necessarily link him to the scene of the crime." We observe that inconsistencies between Mcalister's assertions and the Allen letter regarding Mcalister's gang membership further undermine the trustworthiness of the letter. See State v. Ferguson , 2014 WI App 48, ¶ 31, 354 Wis. 2d 253, 847 N.W.2d 900.