## COURT OF APPEALS
## DECISION
## DATED AND FILED

## May 4, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP360-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2016CF3473

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ROBERT CARR, JR.

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County:  JANET C. PROTASIEWICZ, Judge.  *Affirmed.*

Before Brash, P.J., Graham and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Robert Carr, Jr. appeals a judgment of conviction and an order of the trial court denying his motion for postconviction relief.  He

argues that he presents newly discovered evidence and claims of ineffective assistance of counsel that require an evidentiary hearing or a new trial. We reject Carr's arguments, and accordingly, we affirm.

## BACKGROUND

¶2     Carr was arrested based on allegations that on July 14, 2016, and July 29, 2016, Carr and his son, Nacarrente L. Carr[1] sold heroin to a confidential informant (CI). On August 2, 2016, the police executed a lawfully obtained "knock and announce" search warrant for the property where Carr and Nacarrente both resided. In the search, the police recovered cocaine, heroin residue, drug paraphernalia, and a Remington .45 caliber semi-automatic handgun. Carr was charged with two counts of manufacture or delivery of heroin between three and ten grams as a party to a crime, and one count of possession of a firearm by a felon.

¶3     The case proceeded to trial in April 2018. At trial, the State called an investigator in the Oak Creek Police Department assigned as the task force officer for the Drug Enforcement Administration (DEA) operations targeting state and federal drug offenses. The task force involved officers from multiple jurisdictions. The investigator testified about his investigation into Carr in 2016. The task force identified and surveilled Carr's current address on South 6th Street and his prior address on South 19th Street. The investigator explained he could identify Nacarrente and Carr's voices on the calls recorded by the task force because of his contact with the men before and after their arrests.

---

[1]  We refer to Nacarrente Carr by his first name throughout this opinion.

¶4      The investigator testified that on July 14, 2016, the task force "had scheduled a meeting with a [CI] in order to plan a controlled purchase from Robert Carr." The CI made contact with Carr in a recorded call. The investigator stated that the "initial phone call" was answered by Nacarrente. In the call, the CI made "arrangements to purchase [three] grams of heroin. The phone call kind of gets, I guess, bounced and both Robert Carr and Nacarrente Carr are part of the conversation as far as making the arrangements for the [three] grams and working on the price." The CI asked to speak with Nacarrente's "daddy" on the phone call, the CI then spoke to Carr, they negotiated the price for the heroin, and Carr "directs [the CI] to his old place [on South 19th Street] as far as the buy location." The State played voice recordings from the phone call setting up the controlled buy on July 14, 2016; on the witness stand, the investigator identified the voices of Nacarrente and Carr.

¶5      The investigator testified about the logistics of the controlled buy after the CI set up the location and time. Before the CI went to the controlled buy, the investigator and another task force officer searched the CI's vehicle and searched the CI's person to make sure there were no other drugs, weapons, or money involved. The investigator gave the CI $250 in prerecorded bills. The DEA team maintained constant surveillance of the CI from the time he was searched and given the money until he went to the buy and then met up with the DEA task force again.

¶6      The investigator continued in his testimony, stating that he had surveillance on Carr's residence on South 6th Street and surveillance on the buy location; he and another officer "followed the informant down to the area down on 19th Street" on July 14, 2016. During the controlled buy, the investigator watched

from a distance and identified by sight Nacarrente as the person driving a Chrysler 200, who then entered and exited the CI's vehicle.

¶7    The investigator testified that a similar controlled buy was arranged on July 29, 2016. The CI and Carr arranged that the sale would take place on South 20th Street and Layton Avenue. The investigator explained that after the CI was prepared for the controlled buy, he parked at the arranged location. Over the radio, the investigator was informed by an officer watching Carr's house on South 6th Street that two men left the house in a maroon Blazer.[2] Then the investigator and another officer parked near the arranged buy location and saw "Robert Carr and Nacarrente Carr pull their vehicle into the parking lot." The investigator watched the CI's car to make sure he did not exit the vehicle and that no other person interacted with his vehicle until the Carrs arrived. The investigator reviewed surveillance photographs of the Blazer taken that day and identified Nacarrente in the passenger seat.

¶8    The State played audio clips from the recording device worn by the CI, which included a phone call arranging the July 29 buy and the recordings from the controlled buy itself. The investigator identified Carr's voice on the phone. Although trial counsel raised concerns about which voices were identified, the trial court ruled that it was the jury's role to decide whose voices were heard.

¶9    A sergeant in the Wauwatosa Police Department testified about assisting the investigation and surveillance of Carr on July 14, 2016, and July 29,

_____

[2] The officer whose testimony is recounted in Paragraph 10 is the officer from whom the investigator received this information. The second officer does not identify Carr or Nacarrente by name.

4

2016. On July 14, 2016, the sergeant surveilled Carr's former residence on South 19th Street, and then met with the CI and took custody of the heroin purchased in the controlled buy.

¶10 An officer with the Oak Creek Police Department testified about the surveillance he did during the July 29th controlled buy. The officer watched two males leave the house on South 6th Street, get into a maroon Blazer, and drive off; the officer stopped following them at about South 20th Street and Layton Avenue. The officer took photographs of the two men in the Blazer; three photographs were received into evidence.

¶11 Nacarrente testified for the State in Carr's trial. He testified that on July 14, 2016, his father set up by phone the location for a drug deal. He testified that he and his father both dealt heroin during the summer of 2016. Although he was residing in a house on South 6th Street, in Milwaukee, his father arranged a heroin deal on July 14, 2016, near a house in which they used to live on South 19th Street. By the terms of the deal, Nacarrente "was sent to [the CI] to serve him 2 grams for [$]250, but it ended up for another bag -- it was [$]255." And after the sale, Nacarrente "got back into the Chrysler 200 and sped off through the alley."

¶12 Nacarrente further testified that the second controlled buy was on July 29, 2016. He and his father spoke to the CI, but his father set the price and the location of the deal. The second deal occurred in a store parking lot near South 20th Street and West Layton Avenue. He and Carr drove together to the arranged location and met the CI, who was waiting there for them. "I got out to get into the back seat and the [CI] got in…. He handed me the money but got the drugs from my father." He explained that Carr drove the vehicle during that sale.

5

Nacarrente also testified that the Remington firearm found in the house on South 6th Street during the search after he and his father were arrested belonged to Carr and had been purchased by Carr and his girlfriend.

¶13    On the witness stand, Nacarrente reviewed photographic evidence from the State and identified Carr "outside the house on 6th Street" and "pulling into the buy location" on July 29.  The State again played recordings of phone calls from these drug sales.  Nacarrente identified the voices of the CI and Carr, as well as his own voice on a recording of a July 29, 2016 phone call.  He also identified his own voice and the CI's voice on a recording of a July 14, 2016 phone call.

¶14    Nacarrente testified that he also had been charged for the same conduct and agreed to testify pursuant to an agreement with the State.

> [THE STATE:]  And pursuant to this agreement, what are you asked to do?
>
> [NACARRENTE:]  Just to testify.
>
> [THE STATE:]  And in return, is the State making any promises to you as to what's gonna happen with your case?
>
> [NACARRENTE:]  No.
>
> ….
>
> [THE STATE:]  And when we met, how were you instructed to testify?
>
> [NACARRENTE:]  Just to tell the truth.
>
> [THE STATE:]  And are you doing that today?
>
> [NACARRENTE:]  Yes.

¶15    On cross-examination, trial counsel asked of Nacarrente: "[a]nd while there's no promises that have been made, you are expecting that you would receive some consideration when your cases resolve; correct?" Nacarrente replied, "Yes." On redirect, the State questioned Nacarrente again, this time about his reluctance to testify:

> [NACARRENTE:] You know, I'm fearing for my life a couple times, why I haven't come to court, you know.
>
> [THE STATE:] So I wanted to talk to you about that. So defense counsel referenced a period of time where you weren't showing up to court. Why didn't you show up?
>
> [NACARRENTE:] There's been numerous times I've been shot at. There's threats over Facebook.
>
> [THE STATE:] And so are you saying that—but why not come to court? So people are threatening you outside—.
>
> [NACARRENTE:] Yes.
>
> [THE STATE:] Why not come to court?
>
> [NACARRENTE:] Because I was scared. Even on my way here, on my way in, walking in, you never know what could have happened, you know. It's not everybody can't watch your back for good. It's stuff like that I was scared of. People telling me when they see me—you know, I ain't had no type of car so I would have to get on the city bus. Me standing outside on the street, people see me, shoot at me, and it's not—it's not good.
>
> [THE STATE:] And so even though—has the charges in this case stopped everyone who was participating in this heroin operation from reaching you?
>
> [NACARRENTE:] Yes.
>
> ….
>
> [THE STATE:] And regarding what promises have been made to you, I would assume—do you want me to dismiss your case?

7

[NACARRENTE:] I'm not asking for you to dismiss it.

[THE STATE:] Okay. But you know that that's something that I could do if I decided that that was appropriate?

[NACARRENTE:] Yes.

[THE STATE:] And so you cooperating with the State, you're trying to get that type of consideration?

[NACARRENTE:] Yes.

[THE STATE:] Okay. But again, pursuant to the proffer letter, if you testify truthfully—even if you testify truthfully, there's no promise of consideration?

[NACARRENTE:] Yes.

¶16     An officer with the Wauwatosa Police department also testified that he was part of the task force that surveilled and investigated Carr and participated in the execution of the search warrant at Carr's residence on August 2, 2016. He searched the premises and recovered "several narcotics. We recovered suspected narcotics, some suspected cocaine. We recovered packaging materials. We recovered manufacturing items. We recovered ammo and we recovered one handgun along with numerous identifiers, paper documents in Robert Carr's name." Some of the items recovered were drug processing items including "coffee filters, two open boxes of pure baking soda, an open bottle of vinegar, a Pyrex glass measuring cup, and a fork … all found next to one another." He also explained that a firearm was found in the "northeast bedroom … under the mattress but above the box spring." Additionally, Carr's wallet, auto registration, USPS change of address letter, and one of his bills were found in this bedroom.

¶17     The officer also testified that a Blazer was parked at Carr's residence on South 6th Street during the search and a Blazer was observed during the

8

controlled buy on July 29. The officer explained that the Blazer had different license plates on July 29 during the controlled buy than it did on August 2 during the execution of the search warrant. However, the police search of the registration records showed that both license plates on the Blazer were registered to a Blazer with the same VIN number.

¶18 The State called a controlled substances analyst from the State Crime Laboratory who analyzed the drugs purchased in the controlled buy and entered into evidence. The first item received was a "sealed brown paper bag containing the following: Item A1 is one paper packet containing tan, chunky material. Item A2 … one paper packet containing tan chunks and powder." The analyst's investigation into the substances—using a gas chromatograph-mass spectrometer—showed the presence of heroin and fentanyl. The second piece of evidence analyzed was a "sealed brown paper bag containing a paper packet containing gray, chunky material," which testing showed contained heroin.

¶19 The State called a forensic scientist from the State Crime Laboratory who analyzed materials seized in the search of Carr's residence for latent fingerprints. He analyzed a Pyrex glass measuring cup and was able to identify a print from Carr's left middle finger.

¶20 The State called a DNA analyst from the Wisconsin Department of Justice Crime Laboratory. The analyst testified that "swabs of a firearm that were from the slide, the grip, and the trigger" were analyzed to develop a DNA profile. The results of that testing was compared to a buccal swab from Carr. There was a mixture of DNA from three people on the firearm swabs, but "there was one major contributor" who matched the buccal swab from Carr. In other words, Carr was "the source of the DNA from the swabs of the trigger, slide, and grip." After the

firearm DNA evidence was received the trial court explained that it received a stipulation that before Carr's arrest on August 2, 2016, Carr "was convicted of a felony offense which prohibited him from lawfully possessing a firearm, and that this conviction remained of record and unreversed as of August 2, 2016. These facts are accepted as proven as a fact at trial by the stipulation."

¶21     Carr did not testify and the defense presented no witnesses. The jury returned guilty verdicts on all charges: two counts of manufacturing or delivering heroin between three and ten grams as party to a crime and one count of possession of a firearm as a convicted felon.

¶22     At the sentencing hearing, the State reviewed Carr's history and the evidence in the case. The State argued it was important for the trial court to consider the need to protect the community from Carr's heroin dealing because of the growing number of heroin overdoses. It informed the court that the search of Carr's house showed fentanyl residue on some materials, even if the heroin sold to the CI was only heroin and it was not laced with fentanyl. Further, the State asserted that "some of the most dangerous type[s] of [people] in Milwaukee County" were people like Carr, profiting from heroin and fentanyl dealing. The trial court addressed Carr:

>        I am not here with an opinion that you're a bad person. Human beings are complicated. Sometimes they do things they shouldn't do and make decisions that they shouldn't make. Doesn't necessarily mean you're a bad person. But it means you made some very irresponsible choices that have harmed the community for sure and have had the potential to cause devastation across the community, right?
>
>        So Mr. Carr, I don't necessarily think you're a bad person, but I think you've engaged in very dangerous conduct that's tearing apart the fabric of the community[.]

10

¶23 The trial court sentenced Carr as follows: "[o]n count 1, five years of initial confinement to be followed by three years of extended supervision, 638 days credit; consecutive to count two, five years of initial confinement, three years of extended supervision; consecutive to count three, five years of initial confinement, four years of extended supervision."

¶24 Carr filed a motion for postconviction relief in November 2019 in accordance with WIS. STAT. RULE 809.30 (2019-20).[3] He requested an evidentiary hearing to present newly discovered evidence: a recantation of trial testimony by Nacarrente and a letter from the CI who claimed that the police falsely reported his statement regarding the two controlled buys upon which Carr was convicted. Further, he argued there were eight grounds upon which he received ineffective assistance of counsel from his first, second, and third attorneys. Carr supplemented his original motion to allege two more counts of ineffective assistance of counsel.

¶25 The first piece of alleged newly discovered evidence was an affidavit from Nacarrente made on May 17, 2019, just sixteen days after Carr was sentenced and less than two months after he was convicted. Nacarrente averred that Carr was not involved in the delivery of heroin on July 14, 2016. He stated that he went alone to the buy and Carr did not direct him to sell or deliver heroin to the CI. "I lied in the courtroom to a get a lesser time and because I was scared and high off of extasy [sic], marijuana, and psych meds at the time." He stated his father was home sleeping.

---

[3] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

11

¶26 With regard to the July 29 buy, Nacarrente stated:

> I got a couple of calls early in the morning from the CI asking me to deliver him some heroine [sic] for $255. He asked about my father, and my father told him that he's got to talk to me. I hung up the phone and went back to sleep when he called back, I told him to let me get myself together and meet me on 20th and Layton[.]

Nacarrente stated his father was "at home just getting out of bed" when Nacarrente went to the buy. He listed the same reasons why he lied on the stand. Further, he claimed that the gun found in the house was his own and Carr was unaware that the gun was under the mattress, in other words, Carr never possessed it. Nacarrente claimed that his stepmother purchased the firearm for Nacarrente. He lied about the gun because he was scared he would get charged with felon in possession, but he did not know that he could not be charged with that because he was not a convicted felon.

¶27 The second proffered newly discovered evidence was an affidavit from the CI, who stated:

> I … had never done any drug transactions with Robert Carr by phone or in person. On the dates of July 14, 2016 and July 29, 2016 I did not meet up with Robert Carr and I never spoke with Robert Carr on the phone. On both dates I set up the transactions with Nacarrente and I purchased the drugs from Nacarrente. On July 14, 2016 Nacarrente Carr was by himself when I made a purchase and on July 29, 2016 Nacarrente was with another male unknown to me but who was not Robert Carr. I've only ever done all deals and transactions with Nacarrente Carr none of which involved Robert Carr.

¶28 The trial court denied Carr's motion for postconviction relief without a hearing. The trial court incorporated the State's response brief by reference in its decision. This appeal follows. Additional facts are included in the discussion as relevant.

12

**DISCUSSION**

¶29 Carr requests postconviction relief on two bases: newly discovered evidence and ineffective assistance of trial counsel. For his newly discovered evidence, he argues that Nacarrente's recantation and the CI's statement provide proof that Carr was not involved in the drug transactions for which he was convicted. We conclude Carr has failed to provide sufficient corroboration of his claim and reject his argument. For his claim of ineffective assistance of counsel, he argues there are ten ways that his pretrial and trial counsel performed deficiently and prejudiced his defense.[4] Carr fails to show that his defense performed deficiently or that his defense was prejudiced by any of these claims of deficient performance. Accordingly, we conclude that the trial court's denial of Carr's motion was an appropriate exercise of discretion.

## I. Newly discovered evidence

¶30 "In order to set aside a judgment of conviction based on newly[]discovered evidence, the newly[]discovered evidence must be sufficient to establish that a defendant's conviction was a 'manifest injustice.'" ***State v. Plude***, 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42 (citation omitted). Mirroring the statutory requirements warranting a new trial on the basis of newly discovered evidence in WIS. STAT. § 805.15(3), a postconviction motion must establish by clear and convincing evidence that: "(1) the evidence was discovered after

---

[4] We note that Carr retained three attorneys through his conviction and sentencing. Initially, he was represented by Eric D. Lowenberg. In February 2017, he moved the court to substitute Ann T. Bowe as his attorney. In August 2017, Attorney Bowe moved to withdraw as counsel citing "irretrievable breakdown in communications" that meant counsel could not "effectively represent" Carr. Joseph R. Kennedy then represented Carr through his trial, although new counsel represents him in his pursuit of postconviction relief.

conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *State v. Love*, 2005 WI 116, ¶43, 284 Wis. 2d 111, 700 N.W.2d 62 (citation omitted). We review the trial court's decision to grant or deny a motion for a new trial based on newly discovered evidence under the erroneous exercise of discretion standard. *See Plude*, 310 Wis. 2d 28, ¶31.

¶31 If the defendant establishes the four factors of newly discovered evidence, then a trial court must determine whether there is a reasonable probability that a different result would have been reached at trial. *See Love*, 284 Wis. 2d 111, ¶44. "A reasonable probability of a different outcome exists if there is a reasonable probability that a jury, looking at both the old evidence and the new evidence, would have a reasonable doubt as to the defendant's guilt." *State v. Vollbrecht*, 2012 WI App 90, ¶18, 344 Wis. 2d 69, 820 N.W.2d 443. The determination of a reasonable probability is a question of law. *Id.* If the newly discovered evidence and the reasonable probability of a different outcome are both established, a manifest injustice is shown and a new trial must be ordered. *Plude*, 310 Wis. 2d 28, ¶¶ 31-33.

¶32 Carr's new evidence purports to show that Carr was not involved in the two controlled buys surveilled by the police. Further, Nacarrente's affidavit also alleges that his father did not possess the firearm found in the search of the Carr residence, but that the firearm was purchased by his stepmother for him.

¶33 Nacarrente's affidavit is a recantation of the testimony he gave at trial. Because recantations are inherently unreliable, "[a] claim of newly discovered evidence that is based on recantation also requires corroboration of the recantation with additional newly discovered evidence…, [which shows] that '(1)

there is a feasible motive for the initial false statement; and, (2) there are circumstantial guarantees of the trustworthiness of the recantation.'" ***State v. McAlister***, 2018 WI 34, ¶33, 380 Wis. 2d 684, 911 N.W.2d 77 (footnote omitted) (quoting ***State v. McCallum***, 208 Wis. 2d 463, 478, 561 N.W.2d 707 (1997)).

¶34   Carr argues that Nacarrente's affidavit satisfies the standards for newly discovered evidence. Carr argues that Nacarrente's recantation occurred after his sentencing and therefore could not have been discovered prior to trial, which satisfies the first prong, and he was not negligent in obtaining the information earlier, which satisfies the second prong. Carr also argues that Nacarrente was the State's star witness, which makes his recantation material to the proceedings, satisfying the third prong, and that this new information is not cumulative to the trial testimony, satisfying the fourth prong. He asserts that if the jury heard Nacarrente's testimony in his affidavit instead of his testimony at trial, there was a reasonable probability that the outcome would be different. Finally, he argues that this recantation fulfills the additional requirements for such evidence: (1) Nacarrente had a feasible reason to lie because he hoped to get a lighter sentence, he was under the influence of intoxicants, and he did not understand he could not be charged with felon in possession; and (2) the CI's affidavit corroborates his story, which would provide sufficient guarantees of trustworthiness.

¶35   The State argues that Carr's evidence does not satisfy the newly discovered evidence standard because the new evidence is cumulative to the evidence at trial. "Where the credibility of a prosecution witness was tested at trial, evidence that again attacks the credibility of that witness is cumulative." ***McAlister***, 380 Wis. 2d 684, ¶39. In the context of Nacarrente's recantation, it is unclear if Nacarrente's new statements attacking the credibility of his trial

15

testimony would be considered cumulative, and our review does not require us to determine this issue to conclude that Carr has not satisfied the newly discovered evidence standard to require a new trial or evidentiary hearing.

¶36 The State further argues that the new evidence does not satisfy either required factor of corroboration. Even if we assumed without deciding that Nacarrente was motivated by a desire for a lesser sentence, which seems at least possible for serving as a witness for the State, Carr's attempt to provide a "circumstantial guarantee[] of trustworthiness" of the recantation falls short. *State v. Ferguson*, 2014 WI App 48, ¶31, 354 Wis. 2d 253, 847 N.W.2d 900. Such a guarantee of trustworthiness "may be established by … internal consistency." *Id.* The CI's affidavit does not provide a cohesive narrative with Nacarrente's statement, such that we may conclude internal consistency or indicia of trustworthiness were established. The statements from both Nacarrente and the CI are refuted by the record, including the testimony from law enforcement officers about their surveillance of Carr, Nacarrente, and the CI and the audio recordings played at trial in which the trial court made clear it was the jury's role to determine who was speaking on the recordings. Therefore, we conclude there are not sufficient indications of trustworthiness and the statements do not fully corroborate each other.

¶37 On the issue of the CI's affidavit, Carr asserts this evidence provides corroboration of Nacarrente's recantation, but also can be considered independent newly discovered evidence. The CI's affidavit is not a recantation because the CI did not testify at trial. *See McCallum*, 208 Wis. 2d at 476. Considered independently, we could assume that Carr could not have known about this evidence until after the police testified to an alternate version of events and Carr was not negligent in seeking this information. That the CI affidavit seeks to

16

undermine the testimony given by police about what the CI did and said during the controlled buys could be considered material and not cumulative to trial testimony. However, we conclude that Carr's argument fails on the final stage of evaluating newly discovered evidence: a reasonable probability of a different trial outcome. Carr simply cannot show that the outcome would be different if Nacarrente and the CI testified consistent with the contents of these affidavits at trial. The weight of the trial evidence is simply too strong for this evidence to raise reasonable doubt.[5]

¶38    The State argues that sufficient evidence supports the verdict without Nacarrente's testimony; additionally, it disputes that Nacarrente was the State's star witness. The State presented evidence from law enforcement officers and analysts that connected Carr to each controlled buy and his DNA to the firearm found in his bedroom. The drug task force investigator testified that the July 14th buy was set up by phone call from the CI and the investigator identified Carr's voice in the phone call. In that call, Carr set the price and location of the buy. The investigator also testified that the July 29th buy was set up by a phone call with Carr and that he saw Carr driving the Blazer to the location of the controlled buy. A second officer surveilled the July 29th buy; he testified that he monitored Carr's residence and watched two men enter the maroon Blazer and then followed them to the buy location. The State played recordings from phone calls arranging the drug sales, which allowed the jury to determine whose voices they identified.

---

[5] The trial court stated that the "motives for both witnesses' original statements were known at the time of trial, and their original statements were corroborated by the observations of the investigating officers, the photograph, the audio recording of the phone call, and the presence of the defendant's DNA on the gun." We agree that the evidence in the record supports the convictions and the new evidence does not give reason to doubt it.

Forensic scientists testified to the analysis of the crime scene that showed Carr's fingerprint on the Pyrex measuring cup and his DNA on the firearm.

¶39　We conclude that Carr has failed to undermine the testimony presented at trial. There is no reasonable probability of a different result if this new evidence were presented. *See* *McAlister*, 380 Wis. 2d 684, ¶32. Therefore, Carr has failed to satisfy the newly discovered evidence standard to receive a new trial. The trial court did not erroneously exercise its discretion to deny Carr's motion without a hearing.

## II.　Ineffective assistance of counsel

¶40　Carr makes ten separate claims for ineffective assistance of counsel and requests a *Machner*[6] hearing on his claims. Carr claims that each of the attorneys who represented him throughout this case: (1) failed to talk to the CI; (2) failed to file a *Franks*/*Mann*[7] motion related to the search warrant; (3) failed to follow up on a potential mistaken identification of a vehicle; (4) failed to arrange independent DNA testing or hire an expert to testify; (5) failed to file an alibi defense; (6) failed to file a *Denny*[8] motion. Against Attorney Kennedy specifically, Carr claims that he: (7) failed to question Nacarrente about statements made by the CI; (8) failed to file a motion to compel the disclosure of the person with the CI during the July 29th buy; (9) failed to object to the

---

[6] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[7] *Franks v. Delaware*, 438 U.S. 154 (1978); *State v. Mann*, 123 Wis. 2d 375, 367 N.W.2d 209 (1985).

[8] *State v. Denny*, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984).

introduction of fentanyl or to arrange independent testing of the substance; and (10) failed to object to inaccurate information used at sentencing.

¶41 To prove ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the defendant was prejudiced by counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Our first inquiry is whether the defendant has shown that counsel's performance was deficient. *Id.* "Counsel's conduct is constitutionally deficient if it falls below an objective standard of reasonableness." *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. Our second inquiry is whether the defendant was prejudiced by counsel's performance. *Strickland*, 466 U.S. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court need not address both aspects of the *Strickland* test if the defendant does not make a sufficient showing on either one. *See State v. Johnson*, 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).

¶42 "[T]he [trial] court must hold a hearing when the defendant has made a legally sufficient postconviction motion, and has the discretion to grant or deny an evidentiary hearing even when the postconviction motion is legally insufficient." *State v. Allen*, 2004 WI 106, ¶12, 274 Wis. 2d 568, 682 N.W.2d 433. "[I]f the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief," the trial court has discretion to deny a postconviction motion without a hearing. *Id.*, ¶9. We review the trial court's decision to deny an evidentiary hearing under the erroneous exercise of discretion standard. *See id.*

¶43     The trial court denied Carr's postconviction motion on ineffective assistance of counsel without a hearing after determining that the record conclusively demonstrated that Carr was not entitled to relief.  In our review of the record, Carr fails to show that any of his trial attorneys performed deficiently or that their performance prejudiced his defense.  Therefore, he has not satisfied the constitutional standard for an ineffective assistance of counsel claim.  We review each claim.

¶44     First, Carr alleges that his trial attorneys were ineffective for failing to talk to the CI prior to trial.  Carr argues that if any counsel had spoken to the CI, the CI would have explained that he did not implicate Carr in the controlled buys, which would have undermined the evidence at trial.  The State argues that Carr's assertion that counsel could have impeached witnesses with this information is conclusory and speculative.  His trial attorneys' strategies and decision-making to investigate or not investigate witnesses must be reasonable.  *See Thiel*, 264 Wis. 2d 571, ¶40.  Here, the State presented overwhelming evidence in support of Carr's conviction and the case against Carr was established by more than the CI's statements to police.  Even if we assumed that any of Carr's attorneys were deficient for failing to investigate the CI's statement independently, Carr has not alleged sufficient material facts to support a reasonable probability of a different outcome at trial; therefore, he makes no showing of prejudice.

¶45     Second, Carr alleges that his trial attorneys were ineffective for failing to file a *Franks*/*Mann* motion related to the search warrant.  *See Franks v. Delaware*, 438 U.S. 154 (1978); *State v. Mann*, 123 Wis. 2d 375, 367 N.W.2d 209 (1985).  Here, Carr alleges that because the CI claims that he did not tell the police

that Carr was involved, the police must have relied on false information to obtain a search warrant.[9] The trial court concluded that Carr "made absolutely no showing that the officers knowingly made any false statements in the affidavit that were necessary to a finding of probable cause." *See* ***Franks****,* 438 U.S. at 154-55; ***State v. Mitchell***, 144 Wis. 2d 596, 604, 424 N.W.2d 698 (1988) (explaining that a defendant is only entitled to a suppression hearing on a search warrant if "'the defendant makes a substantial preliminary showing that a false statement made knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit and that this allegedly false statement was necessary to the finding of probable cause'" (citation omitted)). Carr argues there were discrepancies in the search warrant affidavit; however, he does not allege the specific material facts of what trial counsel failed to pursue. Carr's allegations are conclusory and insufficient to support his claims that any of his trial attorneys' performances prejudiced his defense.

¶46    Third, Carr alleges that his trial attorneys were ineffective for failing to follow up on a potential mistaken identification of a vehicle. Carr argues that a similar car, owned by a houseguest, was parked outside his residence during the month of July, which would support his theory that another person or his roommate was the second man in the July 29 controlled buy. In cross-examination at trial, Attorney Kennedy raised the issue of the Blazer outside Carr's residence having different license plates and probed how the police determined it was the same vehicle, which was answered by both license plates being associated with the

_____

[9] In May 2017, Carr attempted to file a motion *pro se* requesting a hearing challenging the truthfulness of Nacarrente's statements, pursuant to ***Mann***. As Carr was represented at the time, this motion was not considered. Our review shows that the motion itself was conclusory.

same VIN number. Because this issue was explored at trial, we conclude that Carr has failed to show that trial counsel performed deficiently. *See* **State v. DeLain**, 2004 WI App 79, ¶18, 272 Wis. 2d 356, 679 N.W.2d 562, *aff'd*, 2005 WI 52, 280 Wis. 2d 51, 695 N.W.2d 484. Further, Carr fails to show how pressing this issue differently would have raised a reasonable probability of a different outcome.

¶47 Fourth, Carr alleges that his trial attorneys were ineffective for failing to arrange independent DNA testing or hire an expert to testify. Carr argues that in a new trial, Nacarrente would testify he put the firearm under the mattress, Carr would state the gun was not his, and a retained postconviction expert would testify that his review of the exhibits, testimony, and evidence showed that the State's analysis of the DNA evidence was not convincing under today's standards of knowledge. The trial court reviewed the expert's letter that discussed the possibility of secondary transference of DNA as the source of Carr's DNA on the firearm. The State argues that Carr has failed to sufficiently allege how trial counsel performed deficiently or how the new DNA expert would create reasonable doubt about Carr's guilt in the jury's mind, and Carr has not produced any evidence that the DNA analysis was flawed. He has not disputed that the possession charge was supported not only by his DNA, but by the firearm being found in the bedroom identified as Carr's based on his personal identification documents being stored in that room. Carr's allegations are an attempt to reargue the case under a different theory of defense. *See* **State v. Maloney**, 2006 WI 15, ¶36, 288 Wis. 2d 551, 709 N.W.2d 436. Carr has failed to allege sufficient material facts that would allow this court to conclude that the failure to engage a DNA expert was prejudicial to his defense.

¶48 Fifth, Carr alleges that his trial attorneys were ineffective for failing to file an alibi defense. Carr argues that he informed his attorneys that he was in

Illinois on July 14, 2016, and three family members could attest to that. However, the State did not allege that Carr was present for the controlled buy on July 14th; instead, he was alleged to have arranged the buy location and price by telephone. Evidence of Carr's voice on the recordings was admitted at trial. The trial court concluded that given the "overwhelming evidence" that Carr participated in arranging the controlled buy by telephone, there was no reasonable probability that mounting an alibi defense would have altered the outcome. *Cf State v. Cooks*, 2006 WI App 262, ¶63, 297 Wis. 2d 633, 726 N.W.2d 322 (counsel was ineffective for failing to investigate witnesses who would have added substance, credibility, and corroboration to defendant's alibi defense). Therefore, Carr has not shown prejudice to his defense based on the failure to pursue an alibi defense because the alleged alibi would not have cleared him from guilt or undermined the evidence in support of his conviction.

¶49     Sixth, Carr alleges that his trial attorneys were ineffective for failing to file a *Denny* motion showing there was a legitimate tendency that a third-party committed the crimes. *See id.*, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984). Carr alleges that his roommate was also coming and going from the same residence during this time period, which he argues means that trial counsel could have pursued a *Denny* defense. However, the State argues that Carr has not set forth sufficient material facts to support a claim of mistaken identity, much less explained how this theory refutes the recordings of Carr's voice arranging the buys or the photographs of Carr in the Blazer. Carr's conclusory allegations do not satisfy the requirement that "the defendant must show 'a legitimate tendency' that the third party committed the crime; in other words, that the third party had motive, opportunity, and a direct connection to the crime." *State v. Wilson*, 2015 WI 48, ¶3, 362 Wis. 2d 193, 864 N.W.2d 52 (citation omitted). We conclude that

Carr has failed to allege that there was a reasonable probability of a different trial outcome if counsel had pursued a ***Denny*** defense; therefore, we conclude Carr has not shown prejudice to his defense.

¶50    Seventh, Carr alleges that Attorney Kennedy was ineffective for failing to question Nacarrente about statements made by the CI.  Carr argues that Nacarrente's testimony would have been impeached if Attorney Kennedy had questioned Nacarrente about his statements about who gave the drugs to whom and who took the money in the controlled buys.  The State argues that Carr's claims are conclusory and meritless.  Carr has not alleged sufficient material facts that show how trial counsel would have impeached Nacarrente's credibility and instead only offers conclusory statements.  Carr cannot satisfy the prejudice prong of our inquiry with speculation.  *See **State v. Erickson***, 227 Wis. 2d 758, 774, 596 N.W.2d 749 (1999).  We conclude that Carr has not shown there was a reasonable probability of a different outcome at trial if the questioning had happened; therefore, Carr has failed to show prejudice.

¶51    Eighth, Carr alleges that Attorney Kennedy was ineffective for failing to file a motion to compel the disclosure of the identity of a person who accompanied the CI during the July 29th buy.  The DEA task force investigator and an officer involved in the surveillance of Carr both confirmed during their testimonies that a person accompanied the CI to the July 29, 2016 buy.  Carr argues that if trial counsel had sought the name of the person with the CI during the controlled buy, counsel could have contacted and questioned the second person about the events.  The State argues that Carr's claim is conclusory and meritless.  Carr speculates about what this person might have said, but his speculation does not demonstrate that trial counsel performed deficiently.  *See **State v. Gutierrez***, 2020 WI 52, ¶45, 391 Wis. 2d 799, 943 N.W.2d 870.  Carr has shown no prejudice

to his defense by his attorney failing to compel the disclosure of the person with the CI at the July 29th buy.

¶52     Ninth, Carr alleges that Attorney Kennedy was ineffective for failing to object to the introduction of fentanyl or failing to arrange independent testing of the substance.  Carr contends that Attorney Kennedy stated that prior to trial, he had not seen a State's report showing the presence of fentanyl.  Carr argues that trial counsel should have objected to the potential admission of this evidence and he should have requested the substance be tested by an independent lab.  Further, Carr argues that trial counsel erred when he brought up the issue of fentanyl in the heroin when he questioned a State Crime Laboratory controlled substance analyst.  The State argues that the introduction of evidence at trial that some of the heroin tested positive for fentanyl did not prejudice Carr because he was only charged with manufacture or delivery of heroin, he was not charged with crimes based on fentanyl.  Further, the State argues that Carr failed to sufficiently allege how additional testing of the heroin would have created reasonable doubt in the jury's mind or changed the result of the trial.  To show prejudice on this issue, Carr would have to show that the failure to object to the fentanyl evidence undermined confidence in the reliability of the proceedings.  *See State v. Diehl*, 2020 WI App 16, ¶41, 391 Wis. 2d 353, 941 N.W.2d 272.  He has not alleged how the jury hearing about fentanyl influenced the verdict convicting him on heroin charges.  We conclude that Carr fails to allege sufficient facts to support his claim of prejudice and relies only on conclusory allegations; therefore, his argument fails.

¶53     Finally, Carr alleges that Attorney Kennedy was ineffective for failing to object to inaccurate information used at sentencing.  Carr argues that the prosecutor "walk[ed] dangerously close" to appearing to assert that Carr caused individuals' deaths through drug sales.  The State rebuts this allegation to state that

Carr's counsel was not deficient for failing to object to the sentencing remarks because the prosecutor did not claim that Carr caused anyone's death. The prosecutor argued that Carr's selling heroin while armed posed danger to the community. The trial court at sentencing agreed with the State that heroin was "tearing apart the community." In its decision denying Carr's postconviction motion, the trial court stated that the State's

> information was not inaccurate, and in any event, it did not impact the sentence the court imposed in this case. This court presided over the defendant's trial and based its sentence only on the evidence presented. The court in no way based its sentence on a belief that the defendant was involved in a heroin overdose death.

Carr's allegations are conclusory and fail to allege sufficient material facts to show that his defense was prejudiced by trial counsel failing to object. As there does not appear to be a valid objection, trial counsel cannot be considered deficient for failing to make a meritless objection. *See **State v. Pico***, 2018 WI 66, ¶28, 382 Wis. 2d 273, 914 N.W.2d 95.. Therefore, Carr has not satisfied either the deficiency or prejudice inquiry to show ineffective assistance of counsel.

¶54     Carr's claims of ineffective assistance of counsel fail. Trial counsel is not considered ineffective merely for having an unsuccessful trial outcome or for having unsuccessful trial strategy. *See **State v. Maloney***, 2004 WI App 141, ¶23, 275 Wis. 2d 557, 685 N.W.2d 620, *aff'd*, 2006 WI 15, 288 Wis. 2d 551, 709 N.W.2d 436. In his written decision, the trial court stated that the "balance of the [Carr's] claims [were] speculative, conclusory, undeveloped and lack[ed] merit." Carr simply did not establish prejudice to his defense or deficient performance in any of his claims against any of his counsel.

¶55 The trial court exercised its discretion to deny Carr's motion for postconviction relief without an evidentiary hearing, having determined he did not plead sufficient material facts and presented conclusory allegations. *See Allen*, 274 Wis. 2d 568, ¶9. We sustain the trial court's exercise of discretion when it "examined the relevant facts, applied the proper legal standards, and engaged in a rational decision-making process." *State v. Bentley*, 201 Wis. 2d 303, 318, 548 N.W.2d 50 (1996). We conclude that the trial court engaged in a rational process in light of the relevant facts and applicable law when it denied Carr's claims of ineffective assistance of counsel.

## CONCLUSION

¶56 For the reasons stated above, we conclude that Carr is not entitled to a new trial or an evidentiary hearing on the basis of newly discovered evidence or ineffective assistance of counsel. We affirm the judgment and trial court order denying his motion for postconviction relief.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

27